BULLION v. AETNA INSURANCE COMPANY.

Opinion delivered January 30, 1922.

1. STATUTES—RULE OF CONSTRUCTION.—Where a word which has a known legal meaning is used in a statute, it must be assumed that the term is used in its legal sense, in the absence of an indication of a contrary intent.

2. STATUTES—CONSTRUCTION—SOURCE OF INFORMATION.—In determining the meaning of a statute, the courts will consider what is the usual and ordinary interpretation given to them by those using them and also consider them in reference to the subject-matter in the mind of the Legislature.

3. INSURANCE—UNDERWRITING PROFITS DEFINED.—Under Crawford & Moses' Digest, § 5962 *et seq.*, requiring the Insurance Commissioner to compile the figures showing the results of the business of stock fire insurance companies during the five years preceding December 31 of each year, and providing that "if it appears that for such five-year period the stock fire insurance companies doing business in this State have made an aggregrate underwriting profit in excess of five per cent. the Insurance Commissioner shall have the power to order such reduction in rates as will reduce the underwriting profit on business thereafter done

to five per cent.", "underwriting profit" is arrived at by deduct-
ing from premiums earned during the five-year period all losses
and expenses incurred during the same period on underwriting
business done in this State.

4.  INSURANCE—UNDERWRITING PROFITS—DEDUCTION OF INCOME TAXES.
    —In determining the underwriting profits for the five-year period,
    the Insurance Commissioner determines *in solido* the underwriting
    profits of all the companies for that period, and in doing so should
    exclude any allowance for income taxes.

5.  INSURANCE—UNDERWRITING PROFITS—COMPANIES TO BE CONSIDERED.
    —In determining the underwriting profits for the five-year period,
    the Insurance Commissioner should include in the tabulation the
    business of all stock fire insurance companies that did business
    in this State under license from the State during any part of said
    period.

6.  INSURANCE—UNDERWRITING PROFITS—CONFLAGRATION HAZARD.—
    In determining the underwriting profits for the five-year period,
    the Insurance Commissioner is not required to make any allowance
    for conflagration hazard.

Appeal from Pulaski Chancery Court, *J. E. Mar-
tineau*, Chancellor; affirmed.

*J. S. Utley*, Attorney General, and *F. G. Lindsey*
for appellant.

Losses paid, rather than losses incurred, are used by
the Commissioner in his calculations. Income and excess
profits taxes are not allowed as an expense. No allow-
ance is made for conflagration hazard.

The law should be liberally construed. C. & M.
Dig., sec. 9728. The purpose of construction is to ascer-
tain the legislative intent. 84 Ark. 411; 106 Ark. 377.
Regard must be had for the known object of the statute
and evil intended to be provided against. 5 Ark. 536; 25
Ark. 101; 34 Ark. 555. Such construction should be
placed on the statute as will not suffer it to be eluded. 3
Ark. 285; 40 Ark. 431; 48 Ark. 308; 27 Ark. 419.

*O. B. Ryon* and *Cockrill & Armistead*, for appel-
lees.

The "incurred method" is the proper way to reach
a profit on loss as distinguished from the "paid for"

method.  179 N. W. 185; Cook on Corp., sec. 546; 7 Paige 198; 4 Rob. 182; Appeal Cas. (1912) 443.

It may be shown by parol that the phrase "underwriting profit" has a technical meaning.  17 Cyc. 685; Wigmore on Evi. sec. 2440; 105 Ark. 518; 113 Ark. 556; 143 Ark. 292; 105 Ark. 197; 102 Ark. 205; 106 Ark. 400; 113 Ark. 325; 151 W. S. 171; 152 W. S. 368; 78 Calif. 285; 56 Miss. 1; 114 N. Y. 190; 104 S. C. 378.  Income and excess profits taxes properly apportionable to the underwriting business in Arkansas should be allowed.  272 Fed. 147; P. W. R. 1920-C 583; 267 Fed. 231; 186 N. Y. 541; P. W. R. 1921-B, 209.  Conflagration hazard should be taken into account in determining the profits, the same as benefits to buildings in improvement districts.  86 Ark. 1.

SMITH, J.  Appellees, who were plaintiffs below, are corporations organized under the laws of the various States of the Union, and all of them are doing a fire insurance business in this State; and all of them were so engaged on December 31, 1919; and most of them have been so engaged for a period of more than five years prior to December 31, 1919.  All these corporations are members of the Arkansas Fire Prevention Bureau, and are all the insurance companies now doing a stock fire insurance business in this State.

These corporations brought this suit to have adjudicated the duties of the Insurance Commissioner of the State under act No. 163 of the acts of the General Assembly approved March 3, 1919, and appearing in Crawford & Moses' Digest as sections 5962 et seq. This act requires the Insurance Commissioner to compile the figures showing the results of the business of stock fire insurance companies during the five years preceding December 31st of each year, and provides that "if it appears that for such five-year period the stock fire insurance companies doing business in this State have made an aggregate underwriting profit in excess of five per cent., the Insurance Commissioner shall have

the power to order such reduction in rates as will reduce the underwriting profit on business thereafter done to five per cent." Sec. 5960, C. & M. Digest. Each five-year period is a unit for the calculation of underwriting profits, and the Commissioner's finding thereon fixes the insurance rates for the first year after that period; and the rate for each subsequent year thereafter depends on the Commissioner's finding for the five-year period immediately preceding.

This action of the Commissioner is made "subject to the summary court review as provided in section 7 hereof" (sec. 5969, C. & M. Digest), and pending this court review his orders are superseded.

The present action is such a review, and it is alleged in the complaint filed for that purpose that the Insurance Commissioner, in the discharge of the duties therein imposed, has attempted to compile the business for the five-year period ending December 31, 1919, but that such tabulation has been made upon an erroneous basis, in this, that the Commissioner has undertaken to arrive at the underwriting profit by calculating the aggregate premiums received and losses and expenses actually paid during said period and ascertaining the ratio of losses and expenses paid to premiums received, which, according to his compliation, was 88.79 per cent., and the Commissioner has treated this result as showing an aggregate underwriting profit for that period of 11.21 per cent, or 6.21 per cent. in excess of the 5 per cent. allowed by said act, and on May 13, 1920, he made an order requiring all stock fire insurance companies to make such reduction, on all premiums collected, on all policies written after said date, and, on June 7, 1920, notified the Arkansas Fire Prevention Bureau to take necessary steps to put such reduction in force. The insurance companies applied for a rehearing, which was granted, but after hearing the representatives of the companies the Commissioner adhered to his original ruling.

In filing this suit to have the order of the Commissioner reviewed and set aside, the companies alleged that the compilation was made upon an erroneous basis, for the following reasons: Stock fire insurance policies are written for terms from less than a year and up to five years, and the full premium for the entire period is collected in advance. The policy used in the State of Arkansas is the standard form, and provides that, for a certain sum (the premium for the entire period), the company insures the insured for a given period. The policy may be canceled at any time at the request of the insured, or by the company by giving five days' notice. Policies must be carried by the company for the entire period before the full premium is earned, or, if canceled, the unearned portion thereof must be returned to the policy-holder. At the end of the five-year period involved in the compilation a very considerable part of the premiums received by the company was still unearned. To arrive at a correct result for a given period to determine the actual underwriting profit requires the charge against the companies of premiums earned, instead of premiums received.

The national organization of fire insurance commissioners, many years ago, adopted a standard "annual statement" for fire insurance comapnies, which form has been in use in Arkansas for more than ten years. It is insisted that the structure of this statement shows that the Commissioner proceeded upon the wrong basis in arriving at the underwriting profit.

The finding of the Commissioner now under review is the second finding made by him under the requirements of the act of 1919 set out above. His first finding covered the five-year period ending December 31, 1919, and in making up this finding the Commissioner employed both methods, but ordered no reduction in the rate, because, from April 1, 1918, to September 1, 1919, the companies had imposed a surcharge of 10 per cent. to cover the extra hazard supposed to result from the state of war then existing, and as this surcharge has

been annulled the Commissioner ordered no reduction in insurance rates. As the surcharge is now no longer imposed, nothing further will be said about it.

The Commissioner discovered, in compiling his first report, that the basis adopted made quite a difference in the result obtained. He designates the basis which he adopted as the "paid-for basis," and under it he has charged the companies with the actual premiums received during the five-year period and has credited them with actual losses paid and actual expenses paid for the five-year period. The companies contend that they should be charged with the premiums earned and credited with losses incurred and expenses incurred, and this method is designated by the witnesses as the premium earned basis.

The Commissioner testified that, upon discovering that there was a considerable difference in the results reached in the two methods, he submitted the question, as to the proper method to employ in ascertaining underwriting profits, to a meeting of rate experts representing the insurance departments of Kentucky, Oklahoma, Missouri, Minnesota, and Arkansas, held in St. Louis, Missouri, on November 7 and 8, 1919, and that these gentlemen made the following report: "That premiums received and losses and expenses actually paid should be the basis on which to predicate for determining the factors on which to base underwriting profit. In this way calculations will be based on actual facts, whereas, on earned premiums and incurred losses results will flow which will effect a continuance of the very thing it is desired to avoid, namely, obtaining figures based upon estimates and assumed amounts. That income and excess profits taxes are not proper items of expense." He further testified that he adopted the paid-for basis because it was the easiest to calculate and apparently obtained the best results for the policy-holder, and that he could not make up his report on the premium-earned basis from the records in his office. Another reason assigned by him for the conclusion reached was that, if the com-

panies were allowed credit for losses incurred, they might carry forward, from year to year, these incurred losses until they were, in fact, paid, and might, as the result of that action, obtain credit more than once for the same items.    His chief clerk was of the same opinion and concurred in the opinion and finding of the Commissioner.    It appears, however, that, while both these gentlemen were experts in matters of accounting, neither qualified as an insurance expert, and it is apparent from their testimony that they have proceeded upon the assumption that they were vested with a discretion to determine what were underwriting profits, and that in reaching this conclusion it was their duty to adopt that method which operated to give the largest reduction in insurance rates.

The act under review has nothing to do with the investment end of the fire insurance business.    It deals only with the underwriting end, and all parties agree that it was the legislative purpose to limit fire insurance companies doing business in this State to an underwriting profit of five per cent. and, as a means to that end, clothed the Commissioner with the duty and authority to raise or lower rates to produce that result, based upon the experience of the companies for the preceding five-year period.    It therefore becomes of controlling importance to determine what is meant by the phrase, "underwriting profit".

In passing upon this question we conceive it to be our duty only to ascertain the legislative intent, and this must be done by interpreting the words which the Legislature itself has employed in expressing that intent. It is an accepted canon of construction that "where a word which has a known legal meaning is used in a statute, it must be assumed that the term is used in its legal sense, in the absence of an indication of a contrary intent." 26 A. & E. Enc. of Law (2nd Ed.) 607.

In the case of *St. L. I. M. & S. R. Co.* v. *State,* 102 Ark. 205, this court had occasion to define the term, "division point," and, in doing so, said: "In determining

what the meaning of these words is, we must look to see what is the usual and ordinary interpretation given to them by those using them, and also to consider them in reference to the subject-matter in the mind of the Legislature, as shown by this statute." Many cases to the same effect are cited in the briefs of counsel for the insurance companies.

We think the undisputed evidence shows that the term "underwriting profit" has long had a definite, certain and well-known meaning in insurance circles. A number of witnesses of highest authority in the insurance business testified that the term was understood alike by all insurance men, and that the word "underwriting" refers to operations of the companies in accepting and carrying risks on the writing of insurance, and refers to that branch of the insurance business in contradistinction to the investment or banking end of the business, and that underwriting profit or loss is arrived at by deducting from earned premiums all incurred losses and incurred expenses. These experts testified that this definition and use of the phrase "underwriting profits" was of universal application in all insurance business, and that a different meaning was first given to it by the Insurance Commissioner of this State in his attempt to give effect to the act now under consideration.

Prior to the passage of this act in 1919, the Insurance Commissioner of this State was required to calculate the reinsurance reserved for unexpired fire risks of insurance companies by taking fifty per centum of the premiums received on all unexpired risks that have less than one year to run and a pro rata of all premiums received on risks that have more than one year to run and, "having charged against a company the reinsurance reserved as above determined, * * * * and adding thereto all other debts and claims against the company, he shall, in case he finds the capital stock of the company impaired to the extent of twenty per cent., give notice to the company to make good its whole capital stock within sixty days, and, if this is not done, he shall require the company

to cease to do new business within this State. * * * * "
Subdivision 6, section 5951, C. & M. Digest.

The Insurance Commissioner testified that the term,
"reinsurance reserve," in the statute quoted, meant "un-
earned premium reserve," and that the latter is the
commonly used term.

It is quite obvious that this legislation treated the
unearned portion of an insurance premium as a liabil-
ity against the company, and not as an asset of the com-
pany.    It cannot, therefore, be regarded as a profit, for
the reason that the law requires the insurance companies
to maintain a reserve against it.    This section, 5951 C. &
M. Digest, was enacted in 1875, and requires the Commis-
sioner to charge all "debts and claims" against the
company, which necessarily includes all losses and ex-
penses which have been incurred, whether they have been
paid or not.

We think this statute defines the status of the un-
earned premium reserve.    If it is in fact a liability, and
not an asset, then it cannot properly be the basis of com-
puting profits.    It is not a profit, for the simple reason
that it is not earned.    It may never be earned.    The
company could not use it for paying dividends or for
other purposes of its own.    Cook on Corporations, (7th
Ed.) § 546, p. 1609.    On the contrary, it must maintain
a legal reserve against it, and if, adding to this rein-
surance reserve "all other debts and claims against the
company", there is an impairment to the extent of twenty
per cent. the Commissioner must declare the company
not sufficiently solvent to do new business in this State.

The Commissioner says, however, that it is not the
purpose of the reports made pursuant to this statute to
enable or to require him to pass upon the amount of
profits earned by the reporting companies, but only to
determine their solvency.    So it is.    But if this is
the proper method to determine solvency, it is necessarily
the proper method to determine whether profits have

been made.    At least, this was the existing law when
the act of 1919 was passed, and we must construe the
two statutes together.

It is shown without question that the premium-
earned basis is the method employed by all insurance
companies in determining what profits have been earned
and whether a dividend can be paid the stockholders.

Numerous very interesting cases are cited in the
briefs of counsel for the insurance companies to the
effect that unearned premiums cannot be said to be
profits.

The objection of the Commissioner to the adoption
of the premium-earned basis, that he could not make a
finding upon that basis from the reports of the com-
panies on file in his office, is equally applicable to the
basis which he did adopt, for he admits that it became
necessary for him to prepare and send out to the com-
panies special blank forms, which he designated as Sched-
ule No. 6, before he could prepare his report in accordance
with the basis which he had decided to adopt.    It is also
shown that, in support of the companies' motion for a
rehearing before the Commissioner, the companies of-
fered to, and did, supply all the information necessary
to make a report on the premium-earned basis, but the
Commissioner refused to change his ruling, for the sole
reason that he thought he had adopted the proper method.
At the time Schedule No. 6 was prepared by the Com-
missioner for the purpose of making the finding re-
quired by section 8 of the act of 1919, a schedule num-
bered 5 was also prepared, the responses to which would
have furnished the necessary data for making a finding
in accordance with the premium-earned basis, and that
schedule was prepared to fit into page 8 of the Con-
vention Annual Blank, of which blank we shall have more
to say.

This Convention Annual Blank takes its name from
the fact that it was prepared and adopted by the Conven
tion of Insurance Commissioners of the different States,

and is in universal use, and has been for many years past. Page 8 of this convention blank calls for a tabulation made on the incurred or premium-earned basis of the business of companies all over the United States; while Schedule 5, prepared on a similar basis, restricts the report to the business done to this State alone, and the tabulation made on that basis by the Commissioner shows that there was no underwriting profit for the five-year period under review.

This difference is said to result from the fact that during the latter part of the five-year period the volume of insurance business in this State increased very largely and very rapidly. Much of this business then written, and already paid for, will have to be carried as outstanding risks by the various companies beyond the five-year period under review. Under these circumstances there has been no underwriting profit if the same is computed according to the premium-earned basis.

Any question as to the manner of securing the necessary data to report on either basis may be disposed of by saying that the law gives the Commissioner the right to call for such data as he sees proper to have, and imposes upon the companies the duty to furnish it.   Secs. 5960 and 5965, C. & M. Digest.

So far as the St. Louis meeting is concerned, it may be said that of the gentlemen who adopted this resolution only two testified in this case, besides Mr. Bullion, the Insurance Commissioner for this State, and those witnesses testified that they were proposing a method for the consideration of the National Convention of Insurance Commissioners, and that the method then proposed was looked on as being the most favorable one to the State and to the policy-holders, and as one easiest obtainable and easiest figured.   The resolution adopted at this St. Louis meeting, set out above, was embodied in a letter addressed to Mr. Joseph Button, Insurance Commissioner of Virginia, who was the chairman of the fire insurance committee of the National Convention of In-

surance Commissioners. The Insurance Commissioners
of Missouri and Kentucky were members of this commit-
tee, and at its meeting on April 18, 1921, both voted,
with all the other members present, that the earned-pre-
mium and incurred method was the proper method to
employ in requiring reports from the companies. This
finding was embodied in a resolution then adopted. At
a prior meeting of this committee in December, 1920,
at which time the Commissioner from Arkansas was a
member and was present, a sub-committee thereof recom-
mended to the full committee that, in determining un-
derwriting profit, earned premiums and incurred losses
and expenses should be used, and that there should not
be taken into account the banking end of the business.
These recommendations were then adopted by the whole
committee, with the Commissioner from this State alone
dissenting.

At the National Convention of the Fire Insurance
Commissioners of the different States held December 7,
1921, the fire insurance committee made the following
report, which was adopted without dissent by that body:

"Through legislative enactment varying degrees of
control over fire insurance rates within their borders
have been assumed by several States. All such laws are
based upon the principle that rates between risks of sub-
stantially the same hazard must not be discriminatory, but
some go further and require that they shall be no higher
than to provide a 'reasonable' underwriting profit. In
one State the percentage of such 'reasonable' profit is
named, and in another a specific requirement is laid down
that the conflagration hazard both within and outside
of the State shall be taken into consideration.

"Further, as it is probable that in the future other
States may enact legislation of similar effect, it is highly
important that this body clearly express its convictions
as to what constitutes a reasonable underwriting profit
and a proper and uniform method of arriving at same.

"Two years ago at the convention session in Hartford this subject was referred to in a resolution, after which the fire insurance committee of the convention met with a committee appointed by the National Board of Fire Underwriters, both bodies realizing the great importance of having an agreement embodying the factors necessarily involved. While it was recognized that the National board had no supervision over rates, it was selected as the only National organization of fire insurance companies. Frequent and lengthy conferences of the committees were held at which the various features were exhaustively studied. The final joint meeting took place in New York in April last when the following was agreed to:

"1. Underwriting profit (or loss) is arrived at by deducting from earned premiums, all incurred losses and incurred expenses.

"2. No part of the so-called banking profit (or loss) should be considered in arriving at the underwriting profit (or loss).

"3. Five years is the minimum period over which a dependable experience can be established.

"4. A conflagration is any loss in excess of a million dollars.

"5. The first million dollars of loss is chargeable to the State in which it originates, the balance being pro rated to all the States (including the one in which it originated) in proportion to the premium income of each State.

"6. A reasonable underwriting profit is five per cent. plus three per cent. for conflagrations. The three per cent. allowance for conflagrations is subject to revision if and when the records of conflagrations to be collected by the National board show that such three per cent. is excessive or inadequate."

This report is of course advisory in its nature, and binding upon no one, but it does show what these officers understood underwriting profit or loss meant.

It does not appear that the Commissioner of Arkansas attended this convention, although Arkansas is the State referred to in the report as having a fixed percentage of insurance rates. This report appears to have been adopted by the unanimous vote of all the Commissioners present.

. It thus appears that underwriting profit or loss has a known meaning as the sum arrived at by deducting from earned premiums all incurred losses and incurred expenses, and that the term, as thus interpreted, has long been employed in the insurance business, and we must therefore conclude that it was so used in the act of 1919, nothing to indicate a contrary intention appearing in the act.

Having reached this conclusion, we should not be swerved from so interpreting it by any consideration of the results obtained. It may be said, however, in passing, that the fear expressed by the Commissioner that, if he adopted the premium-earned basis, losses would be pyramided, that is, credit would be given more than once for the same losses, appears to be without foundation. It is very clearly shown that this could not be done without deliberately falsifying reports, and a false report could, of course, be made on either basis. It is shown that the "Convention Form of Annual Statement" automatically takes care of this by requiring deductions to be made of profits and credits taken, and in the same way any errors of estimation are taken care of by deductions in the next period.

The court below made the following findings: "The words 'underwriting profit' have had for a long number of years, and now have, a well known, established and defined trade meaning, to-wit, net premiums earned less losses and expenses incurred in the business of writing fire insurance, and that those words were used in that sense in the act under consideration in this case." Upon this finding the court ordered that, in making up his tabulations, the Insurance Commissioner should use, in said

calculation, the aggregate net premiums earned during the five-year period, as distinguished from the net premiums received, and that he should use losses incurred during said period, as distinguished from losses paid, and should use expenses incurred, as distinguished from expenses paid.

It follows, from what we have just said, that this finding and order of the court is correct, and it is approved.

The court below also found "that the Insurance Commissioner should allow as expenses that part of the income and excess profits taxes and all other taxes paid or incurred to the United States government during said period which is properly apportionable to the underwriting business done in Arkansas." We do not concur in this finding. Underwriting profits must, of course, be taken into consideration by the directing officers of the insurance companies in casting up their accounts to determine what sum has been earned; but our statute does not undertake to regulate earnings of the capital stock of the companies. The act does not deal with capital stock, nor dividends to be paid thereon. It deals with underwriting profits, and, as we have shown, that term has a well-defined meaning, and is arrived at by deducting from earned premiums all incurred losses and incurred expenses. The income taxes are based upon profits. The thing the Commissioner determines is not the general business outcome of the reporting companies, but their underwriting profits in this State. He has no concern at all in making the tabulations with the investment end of the insurance business, either in or out of this State. Insurance companies pay income taxes on their business as a whole; both the underwriting and investment ends are considered for that purpose. Insurance companies might sustain such losses on their general business, through conflagrations elsewhere, or through other causes, as to have no income taxes to pay; but this would not affect their underwriting profits in

this State. In other words, for the purposes of this act, the State of Arkansas is the sole unit to be considered, and the underwriting profit in this State is the sole subject of inquiry. The Commissioner does not take into account the balance sheet of any particular company. Some companies may have income tax to pay, while others may not. He considers the companies in the aggregate, and not separately, and it is unimportant to him whether the general business of any particular company will require the payment of income taxes or not. He determines *in solido* the underwriting profit of all the companies for a given period and, in doing so, he should exclude any allowance for income taxes.

The court below also found "that the Insurance Commissioner should include in said tabulation the business of all stock fire insurance companies that did business in this State under license from the State during any part of said period." We think the court was correct in this finding. The manifest purpose of the Legislature was to ascertain the result of the business done by all the insurance companies during the five-year period under consideration. It is unimportant what companies do the business. The thing to be ascertained is what was the result of the five years of business, and in arriving at that fact the Commissioner should take into account the reports of all companies covering any portion of the five-year period. If reports cannot be obtained from companies which have heretofore withdrawn from the State, their business, of course, cannot be included in the tabulation; but that fact affords no reason for excluding reports which are available from the companies which were not doing business at the end of the five-year period. Because the tabulation cannot be made absolutely accurate, by including all those companies which have done business in the State for any part of the five-year period, is no reason for not making the tabulation as nearly accurate as can be done by including reports which are available.

Upon all questions thus far discussed and decided by us, the findings of the court below were in favor of the insurance companies. The court below made a finding adverse to them, and from that finding the companies have appealed. This finding was that "the Insurance Commissioner is not required by the act under consideration to make any allowance for conflagration hazard." We think the court was correct in this finding. It is a fact, as stated above, that, at the last National convention of the Insurance Commissioners of the different States, the Commissioners adopted a resolution to the effect that conflagration hazard should be taken into account in fixing rates. But that body was not undertaking to interpret our statute, nor, as we have said, would we be bound by their action if they had done so. Their resolution dealt with the manner of determining reasonableness of rates, and their report shows that only one State had fixed a definite per cent. of underwriting profit, which State, as we have said, is our own, thereby determining what was reasonable. That part of the resolution in regard to conflagration hazard was advisory to those Commissioners acting for States whose statutes provided for reasonable profits. In determining what is a reasonable profit it is no doubt proper to consider conflagration hazard, but presumptively our Legislature did this. It has fixed five per cent. as reasonable, and we cannot presume that the Legislature omitted any item which should properly have been considered. This finding of the court below is affirmed.

It follows, therefore, that the findings and decree of the court below, except in so far as it relates to the allowance for income taxes, is affirmed.

Mr. Justice WOOD concurs except as to Federal income and excess profit taxes, which he thinks should be allowed as an expense of the business, that this tax should be apportioned, and the companies should receive credit

for the income and excess profit taxes on the income and excess profits derived from the underwriting end of the business in this State.

Wood, J., (concurring in part and dissenting in part).

1. It is contended by the appellant that the method adopted by him to ascertain the underwriting profit is favorable to the State and to the people, and that the method contended for by the appellees is favorable to themselves and no others. On the other hand, it is contended by the companies that it would be destructive to the insurance business in this State to write insurance on rates fixed upon the basis of premiums received and losses and expenses paid instead of premiums earned and losses and expenses incurred. J. G. Leigh, the general agent for ten insurance companies, testified that it would be ruinous to the insurance companies if they were required by the act under review to write insurance according to rates fixed by the method adopted by the Insurance Commissioner in determining the five per cent. of underwriting profit allowed by the statute; and that such method would result in driving the insurance companies out of business in this State. If this statement be correct, then it is manifest that no greater calamity in a business way could befall the people of this State than the passage of this law. For, it is well known that adequate insurance is a basis of credit and security in practically all lines of business, and the Legislature would be doing the people of the State an irreparable injury and a great wrong to deliberately enact laws that would paralyze commercial and other business transactions.

These respective contentions lead me to observe that if the Legislature intended by the use of the term "underwriting profit" to adopt the method of computation used by the Commissioner to ascertain such profit, then it would be the duty of this court to so interpret the law, even though it had the effect of driving out every insurance company now engaged in business in this State. On the other hand, if it was the intention of the Legislature

by the use of the term "underwriting profit" to adopt a "trade term" which had a well understood and well defined meaning in trade circles, having certain definite and fixed methods of ascertainment by those engaged in the business of insurance, then it is the duty of the court to interpret the statute so as to give effect to the intention of the lawmakers as derived from the language of the enactment, regardless of whether such interpretation is favorable or unfavorable to the insurance companies or to the people of the State carrying insurance. In other words, the wisdom and policy of this law was addressed solely to the Legislature. Neither the Commissioner, nor the courts, out of any considerations of expediency, are authorized to give the act an interpretation which is plainly repugnant to the legislative purpose as expressed in the language of the act itself. We must interpret the act as we find it, regardless of the effect it may have on the insurance companies or those who buy insurance.

See *Little Rock* v. *North Little Rock*, 72 Ark. 195-201 and other cases cited in my dissenting opinion in *St. L. I. M. & S. R. Co.* v. *Webster*, 99 Ark. 265-290-291. The judiciary has no power to impute to the General Assembly any other than an honest intention through its enactments to promote the public weal. Grigsby's Criminal Law, 17, sec. 21; *State ex rel. Linde* v. *Taylor*, 33 N. D. 76, Am. Cas. 1918-A 538; *People* v. *Glenn Co.*, 35 Pac. 302-4; *U. S.* v. *Des Moines, etc., Co.*, 142 U. S. 510-44; *Atchison, T. & S. F. R. Co* v. *State*, 40 L. R. A. (N. S.) 1 and note, p. 29.

Mr. J. G. Leigh testified that he was the general agent for ten insurance companies doing business in Arkansas; that he wrote every word of the act under review—"fought, bled and died for every word of it"; that it was his purpose to create a condition fair and equitable and just to the insurance companies and to the people of the State who were buying insurance; that he was not representing the insurance companies in draft-

ing it; that they objected strenuously to some of its provisions. This testimony, of course, could only mean that he drafted the bill which the Legislature, through its appropriate committees, and otherwise, investigated, and approved by enacting the same into a law. It was exclusively within the legislative function to fix the maximum per cent. of "underwriting profit." It could have designated a greater or less per cent. than the five per cent. named; or it could have left the matter entirely to the judgment and discretion of the Insurance Commissioner to determine what would be a fair and reasonable per cent. of "underwriting profit." It could have prescribed the particular methods which the Commissioner should use in making the computation to ascertain whether the companies had made a profit exceeding the five per cent. named; or, if unnamed, the specific methods to be used in determining what was a fair and reasonable profit. This the law-making power did not see fit to do, but on the contrary expressly used the term "underwriting profit" without further definition or explanation. All of which unmistakably shows that the trade term "underwriting profit" was used in the technical sense, *i. e.,* with the meaning which that term has in insurance circles. The testimony of witness Leigh showing the history and source of the act under consideration is illuminating, because it shows that the Legislature adopted the draft of the bill as it came from the hands of one whose position and long experience in the insurance business made him familiar with the meaning of the term "underwriting profit" and the methods used in insurance circles to determine same.

Mr. Leigh's testimony and that of every other insurance rate expert shows that in insurance circles and according to insurance terminology the words "underwriting profit" have one and only one definite and well understood meaning; that meaning is arrived at by one and only one definite method of calculation. That meaning is: "What the companies have left over from the

premiums earned after deducting the losses and expenses incurred'' during the period designated. All of the witnesses give the same definition in practically the same language. To quote from one is to quote from all. Frank M. Speakman, who was employed by the appellant in the examination of different insurance companies from time to time as consulting actuary, and who was not in the employ of, or connected with, any insurance company, testified: ''I am familiar with the Arkansas act of 1919 under consideration and know that the phrase 'underwriting profit' used in the act has had for a number of years among accountants and the insurance fraternity a well established and well defined meaning. It has only meant one thing, and that is the profit left over after the company has been charged with premiums earned and taken credit for losses and expenses incurred.''

The record shows that the committee of the National Convention of Insurance Commissioners, composed of commissioners of eleven States, and the actuarial bureau committee of the National Board of Fire Underwriters recommended the same method of ascertaining underwriting profits as is shown by the testimony of the insurance rate experts above. The appellant alone dissented from the views of these committees.

Since the Legislature used the trade term ''underwriting profit'' and nowhere in the act used any language indicating that it had employed this term in any other than a technical sense and with the meaning given it by those engaged in the insurance business, it must be conclusively presumed that the Legislature intended that the words ''underwriting profit'' should have the meaning given them in insurance circles. To ascertain what that meaning is, the testimony of insurance rate experts and the recommendation of the committees of the National Convention of Insurance Commissioners and of the National Board of Fire Underwriters were all competent evidence to prove the meaning of the term ''underwriting profit.'' See *National Union Fire Ins.*

*Co.* v. *Dickinson,* 128 Ark. 367. If not the undisputed, at least the overwhelming, weight of the evidence shows that the meaning of the term is as above set forth in the testimony of Leigh and Speakman. Unless we shut our eyes to the facts and refuse to respond to the preponderance of the evidence, and fail to apply the law applicable thereto, the only correct conclusion on this branch of the case is that reached by us and voiced through the opinion of Mr. Justice SMITH. He has stated the reasons for the conclusion of the majority on this subject with great cogency and clearness and has cited the authorities to sustain the views there expressed. I know of no authorities to the contrary. I wish, therefore, to express my unqualified concurrence in all that he has said of the meaning of the words "underwriting profit" used in the statute. From my viewpoint, there is no well founded room for a difference of opinion.

Moreover, even if there had been no testimony in the record explaining the meaning of the technical term "underwriting profit" this court, applying business principles and correct rules of accounting, could have only reached the same conclusion without the aid of the testimony of insurance rate experts, that it has arrived at with such aid. For, to my mind, applying to the insurance business sound rules of bookkeeping and accounting —the tests applied in any ordinary business—the premiums earned represent the actual income or profits and the losses incurred (which includes expenses) represent the losses. Therefore, deduct from the premiums earned the losses incurred, during any given period, and the result will show the net profit or loss for such period. For any given period this method represents a closed business transaction, and is a sound rule of computation. Any other would be mere speculation. See the able opinion of the House of Lords and Privy Council in *Sun Insurance Office* v. *Clark,* "House of Lords and Privy Council" Appeal Cases (1912) p. 443.

2.  The statute makes any action of the Insurance Commissioner in the matter of determining whether or not the companies have made an aggregate underwriting profit in excess of five per cent. subject to ''summary review in any court of competent jurisdiction.'' Sections 5968 and 5969, Crawford & Moses' Digest. The Insurance Commissioner, in making his computation, refused to allow the insurance companies credit for the Federal income and excess profits taxes as an element or item of expenses incurred, and refused to allow the companies credit as expenses incurred for such proportion of those taxes as should be borne by the underwriting end of the business in this State. The chancellor found that the ''Insurance Commissioner should allow as expenses that part of the income and excess profits taxes and all other taxes paid or incurred to the United States Government during the five-year period which is properly apportionable to the underwriting business done in Arkansas.''

The majority of the court reverses the finding and decree of the chancellor in this particular and sustains the finding of the Insurance Commissioner. I find myself unable to concur with my associates in this conclusion. I am convinced that the chancellor was correct in his decree and finding in this as well as all of his other findings. His decree, in my judgment, should be affirmed throughout. As I understand, the undisputed testimony shows that the Federal income and excess profits taxes allocated to the underwriting end of the business in this State, incurred and paid during the five-year period, amounts to the sum of $72,000, or about one per cent. of the total expenses incurred. Under the statute the Insurance Commissioner is not allowed to order any reduction in rates until there has been an underwriting profit in excess of five per cent. As I construe the statute, it guarantees to the companies a net profit of five per cent. on the underwriting end of their business in this State. Now, there is no net profit in the business of insurance, or in any other business for that matter,

until all the expenses of every character, including both State and Federal taxes as well as every other legitimate and necessary expense of carrying on the business, have been deducted from the gross income of such business. There is no more reason for deducting the State taxes as a necessary expense of the business than Federal taxes. These taxes, both State and Federal, are burdens on the business that must be borne. There is no escape from them. Assuming, as we must, that the companies are doing an honest and legitimate business, the Federal income and excess profits taxes are inescapable expenses incident to the business; as much so as office rent, agency service, or any other legitimate expense required in the operation of the business. Would any bank, insurance company, mercantile firm, or corporation of any character, or any individual engaged in any business enterprise leave out of their loss account the taxes incurred, during any given period in casting up an account of profits and losses on such business for such period? Certainly not. No correct system of accounting would justify entering any amount to the credit of the surplus account in any business until it had been first ascertained that there was an excess of income over outlay in the necessary conduct of the business.

There is a vast difference between constitutions or statutes which merely protect public utilities in the right to a fair and reasonable return on their business and those statutes which guarantee a certain fixed per cent. or profit. See *Galveston Electric Co.* v. *Galveston,* 272 Fed. 272. Our statute, as I construe it, guarantees the insurance companies doing business in this State during the period named, in the aggregate an underwriting profit of five per cent. That amount is definitely named as the maximum limit of underwriting profit. But they are entitled to, and are guaranteed, that much before the Insurance Commissioner is authorized to order any reduction in rates. I cannot comprehend the logic that leads to the conclusion that these taxes are not a neces-

sary part of the expenses incurred, because, forsooth, they are laid by the general government on the income and profits of the business *in solido;* that is, including both the underwriting and investment or banking end of the business. These taxes are levied and paid, it is true, upon the business of the companies as a whole. They are an expense and burden to the business as a whole, but the underwriting end necessarily bears its proportion of the burden, and, assuming that the books are properly kept, as we must, no doubt these taxes are properly apportioned and distributed respectively to the underwriting and banking ends of the business. If they are not, it is certain that they can and should be. In determining whether or not there is a profit in excess of the five per cent. guaranteed by the statute these taxes should be apportioned and the companies given credit for the amount so apportioned to the underwriting end as necessary expenses incurred in carrying on that end of the business. See *Consolidated Gas Co. v. Newton,* 267 Fed. 231-259. Also *Municipal Gas Co. v. Public Service Commission,* 186 N. Y. Sup. 541-549.

If these taxes, as the proof shows, when apportioned to the underwriting business in Arkansas, amounted to about one per cent., then, if the Commissioner fails to allow the companies credit for these taxes as a part of their expenses, instead of receiving the five per cent. which the statute guarantees them, they would receive only four per cent. It is not for the Commissioner or this court to say that they are only entitled to four per cent. net profit when the statute expressly guarantees them five per cent. *In re Mutual Telephone Co.,* P. U. R. Anno. 1921-B p. 209, it is held by the Public Utilities Commission of Hawaii in an able opinion by Carden, the chairman of the commission, that all taxes, Federal and territorial, should be allowed as proper expenses of operation. Adopting in substance the language of that commission, if income taxes are disallowed as incurred expenses of the business, the net result is that, instead of

being allowed the five per cent. which the statute guarantees, the amount really allowed by the Insurance Commissioner would be five per cent. less the one per cent. of income taxes which the companies are compelled to pay. It seems to me, therefore, that the income and excess profits taxes should be considered as a part of the legitimate expenses incurred in carrying on the business, and that the insurance companies do not receive a net clear profit of five per cent. unless they are given credit for these taxes in the computation made by the Commissioner. Such was the view of the learned chancellor. His findings and decree are correct in all particulars, and should be affirmed.

McCULLOCH, C. J., (dissenting). It seems manifest to me that the framers of the statute under consideration meant that the Insurance Commissioner should "compile the figures showing the results of the business for the five years next preceding" by obtaining the same from the annual reports of statements required under another statute. Crawford & Moses' Digest, § 5979.

The two statutes, taken in the order in which they should be considered with reference to the question before us, are as follows:

"Every insurance company, including individuals, partnerships, joint-stock associations and corporations, conducting any branch of insurance business in this State, must transmit to the Insurance Commissioner and State Fire Marshal a statement of its condition and business for the year ending on the preceding thirty-first day of December, which statement shall be rendered on the first day of January following, or within sixty days thereafter, except that foreign companies shall transmit their statement of business other than that done in the United States prior to the following first day of July, which statements must be in form, and state the particulars required by the blanks prescribed by the Insurance Commissioner and State Fire Marshal." Crawford & Moses' Digest, § 5979.

"The Insurance Commissioner shall, each year after the filing with him of the reports of the various fire insurance companies doing business in this State, as required by law, compile the figures showing the results of the business for the five years next preceding the year in which the tabulation is made. If it appears that for such five-year period the stock fire insurance companies doing business in this State have made an aggregate underwriting profit in excess of five per cent., the Insurance Commissioner shall have the power to order such reduction in rates as will reduce the underwriting profits on business thereafter done to five per cent. Any reduction ordered by the Insurance Commissioner shall be effective on all policies written after issuance of such order and may, with the approval of the Insurance Commissioner, be applied to such class or classes of risks as the fire insurer, the rating bureau or bureaus may select. Any action of the Insurance Commissioner in this connection shall be subject to summary court review as provided in § 5968." *Id.* § 5969.

If it was not the intention for the figures to be taken from the annual statement, there was no reason for referring to those statements, and the reference shows clearly, I think, that the intention was for the compilation and tabulation to be taken from the annual statements. Other information might become necessary in order to complete the compilation, but the annual statements were intended to be the basis.

The statute provides that the "statements must be in form, and state the particulars required by the blanks prescribed by the Insurance Commissioner." Now, the undisputed record is that the Insurance Commissioner has always prescribed the form which has been adopted by the association known as the "Convention of Insurance Commissioners," and the form was commonly designated as the "Convention Annual Blank." This form has been used exclusively up to this date, and the framers of the statute (§ 5969) are presumed to have taken cognizance

of that fact in adopting the language which they used. They had in mind that the Commissioner would, in fixing rates of insurance, act upon the figures set forth in the statement made on the Convention Annual Blank. Now, it is undisputed that the form did not show or call for a statement of the net earned premiums in this State, but, on the contrary, it called only for net premiums received. It did not call for nor contain a statement of incurred losses, but called for losses paid. Schedule 5, referred to in the opinion of the majority, was not a part of the Convention Blank, and was never used in any annual statement. So the Commissioner concluded—correctly, I think—that his duty was to base the rate of premiums for the succeeding year on what the annual reports showed—net premiums received and losses actually paid. If it were otherwise intended, it would be necessary for the Commissioner to obtain from the companies additional information as to unearned premiums to be credited at the end of the five-year period and as to earned premiums to be charged in the beginning of that period which had been received during the prior years. The Commissioner would also have to obtain additional information as to the differences between losses paid and incurred losses.

It should be borne in mind that the statute under consideration contemplates, not a single instance of rate-fixing, but a continuing plan or scheme for fixing insurance rates year after year, based on earned profits during the preceding five-year period. The statute does not require absolute accuracy in ascertaining the earned profits for the preceding period, an approximation being all that could be hoped for in the adoption of a general plan for the ascertainment of values or profits.

The Insurance Commissioner was clothed with authority, and a certain discretion was vested in him, to adopt details which would work out approximately accurate results—not for a single period, but from year to year. In the first place, the Commissioner was authorized

to determine and prescribe the form of blank to be used and the substance of the statements to be made therein. He was next directed by the later statute to ascertain from these annual statements the nearest obtainable approximation of the profits derived from the insurance business in Arkansas during the preceding five-year period and to fix the rates based upon those profits. Whatever difference there may be shown between the plan adopted by the Commissioner and that insisted upon by the insurance companies concerning the rates to be fixed for the particular year now under review, I cannot conceive that it would make any substantial difference in the future which of the plans should be adopted, for, if the rate is to be readjusted each year, any losses in profit during one period will be shown in the next period and the rate correspondingly increased or reduced. If, in fixing the rate for a given year, the unearned premiums at the end of the preceding five-year period must be deducted, then it follows, as before stated, that the premiums earned at the beginning of that period which were received during the preceding period must also be charged in determining the amount of net profits. So it is with the difference between the plan for accepting incurred losses as the basis of profits, rather than losses paid. The difference between the two will necessarily be developed in the next period, so, after all, it will be broad as it is long.

Certainly the plan adopted by the Commissioner is commendable in the fact that it is definite and the facts are more definitely and reliably ascertainable than under the plan proposed by the companies.

It seems to me that the most that is involved in the present lawsuit is that the companies are seeking to dictate the method of ascertaining profits, for the reason that it suits them in this particular emergency to claim credit for unearned premiums rather than permit the Commissioner to prescribe the plan as the statute directs.

The question for us to determine in passing upon the validity of the plan adopted by the Commissioner is, not whether it has proved inaccurate in a single instance, but whether it is a reasonable plan which will work out approximately correct results from period to period.

I cannot agree with the court that there is anything at all in the evidence in this case which tends to show that the term "underwriting profits" has a fixed and definite meaning established by general custom. All that the evidence shows is that there is, and has been for a long time, a prevailing custom with insurance companies of ascertaining their profits by deducting unearned premiums. This is not a definition of the term, but merely a customary method of ascertaining the results. It is not a fixed definition which the lawmakers are presumed to have had in mind when when they enacted the statute, for it is obvious from the language of the statute that it was meant to vest in the Commissioner the power and discretion to adopt a plan for ascertaining what profits have been earned from time to time in fixing the rates for the ensuing year.

I also dissent from that part of the opinion of the majority holding that profits earned by companies which have withdrawn from the State prior to the end of the stated period should be considered in fixing the schedule of rates. The statute, as I have already shown, contemplates that the figures should be compiled from the annual reports made by the companies doing business in this State, and if they have withdrawn from the State there are no annual reports made by them from which the figures can be compiled.

I agree with the majority in holding that the companies are not entitled to credit for the amount of income and excess-profit taxes nor for allowances for what is termed "conflagration hazard."

Mr. Justice HUMPHREYS concurs in this dissent.