196 Pa. Superior Ct. 221 (1961)
Pennsylvania Insurance Department
v.
Philadelphia, Appellant.
Superior Court of Pennsylvania.
Argued June 12, 1961.
September 19, 1961.
*224 Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P.J., absent).
David Berger, City Solicitor, with him Lewis Kates, Deputy City Solicitor, and Levy Anderson, First Deputy City Solicitor, for City of Philadelphia, appellant.
Michael J. Stack, Jr., Deputy Attorney General, with him Charles V. Walsh, General Counsel, Insurance Department, and Anne X. Alpern, Attorney General, for Commonwealth, appellee.
Robert H. Young, with him Donald A. Scott, Arthur Littleton, John A. Skelton, and Morgan, Lewis & Bockius, *225 for Middle Department Association of Fire Underwriters, intervening appellee.
OPINION BY WOODSIDE, J., September 19, 1961:
This is an appeal from an order of the Court of Common Pleas of Dauphin County sustaining an adjudication of the Insurance Commissioner approving a rate filing by the Middle Department Association of Fire Underwriters.
The filing and adjudication were made under The Fire Marine and Inland Marine Rate Regulatory Act of June 11, 1947, P.L. 551, 40 P.S. § 1221 et seq. We are concerned here with fire insurance rates only.
As this is the first insurance rate filing case to reach either of our appellate courts, a brief history of insurance regulation and rate making is in order. It has long been settled that the insurance business is charged with a public interest, and that its regulation is constitutional. Commonwealth v. Vrooman, 164 Pa. 306, 30 A. 217 (1894); German Alliance Insurance Co. v. Lewis, 34 S. Ct. 612, 233 U.S. 389, 58 L. Ed. 1011 (1914). Historically, the regulation of insurance has been recognized as a function of the states rather than a function of the federal government. For many years no effort was made in any court proceedings to apply the Sherman Anti-Trust Act and other Acts of Congress to insurance, on the grounds that insurance was not interstate commerce, and that Congress did not intend its general acts to relate to insurance.
In 1944 the Supreme Court of the United States held that insurance companies which conduct their activities across state lines are within the regulatory power of Congress under the Commerce Clause of the Federal Constitution, and that insurance was subject to the Sherman Anti-Trust Act. United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944).
*226 Congress, thereupon, enacted the McCarran-Ferguson Act of March 9, 1945, 59 Stat. 33, 15 U.S.C.A. §§ 1011-1015, which, as amended, provided, inter alia, that the business of insurance should be subject to the laws of the several States, and not to the Acts of Congress (unless such acts specifically relate to insurance), except that the Sherman Act, and certain other acts should be applicable to the business of insurance after June 30, 1948, to the extent that such business is not regulated by State Law.
Relatively few states had entered into the field of insurance rate regulation prior to 1945, but by June 30, 1948, all of the states had passed rate regulating legislation. The opinion of the Supreme Court of the United States in 1944 and the action of Congress in 1945 caused the National Association of Insurance Commissioners to prepare model rate regulatory acts which, with variations, were promptly adopted by Pennsylvania and most other states.
Pennsylvania adopted The Casualty & Surety Rate Regulatory Act of June 11, 1947, P.L. 538, 40 P.S. §§ 1181-1199, with which we are not here concerned, and The Fire Marine and Inland Marine Rate Regulatory Act of June 11, 1947, P.L. 551, 40 P.S. §§ 1221-1238, supra, with which we are here concerned, and which we shall hereafter refer to as the Regulatory Act.
The purpose of the Regulatory Act as expressed in its first section "is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, to enable authorized insurers to meet all requirements of the insuring public of this Commonwealth, and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this Act. Nothing in this Act is intended (1) to prohibit or discourage reasonable competition, or (2) to prohibit or encourage uniformity in insurance rates, rating systems, rating plans or practices. *227 This Act shall be liberally interpreted to carry into effect its purpose as herein set forth." (Emphasis supplied.) 40 P.S. § 1221.
With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and compliance with the law. This has discouraged companies from charging "inadequate" rates. Generally, insurers were prevented from charging "excessive" rates by the keen competition which has long been prevalent in most segments of the insurance business.
Prior to the advent of state rate regulation, the fixing of rates having a proper relation to the risk involved, and thus not "unfairly discriminatory" had been a problem of long standing to insurance companies. It is evident that the risks in fire insurance vary substantially, and are influenced by many factors, including the type of construction of the building insured, its proximity to hazardous risks, the use to which it is being put, and the fire protection available in the area. It is evident, too, that with hundreds of insurance companies paying losses in the same area, the loss experience of any one company may not be sufficiently broad to form the basis for fair rates with any degree of refinement. On the other hand, the combined loss experience of all the companies paying losses makes possible the formulation of rates which more nearly reflect the actual risk. Rates based upon the experience of many insurers are likely to be more equitable to both the insurer and the insured than rates based upon a more limited experience.
*228 The difficulty involved in each company establishing its own rates and the need for greater experience led to "co-operative action among insurers" and the formation of associations to gather loss statistics and make fire rates which the member companies generally agreed to follow. The Middle Department Association of Fire Underwriters, known in the trade as the Middle Department, is such an association. It has 360 members and subscribing insurance companies doing a fire insurance business in Pennsylvania. Under a license from the Insurance Department, issued under § 6 of the Regulatory Act, 40 P.S. § 1226, it prepares and files the premium rates which are charged by all of its members and subscribers except those which file deviations from those rates with the Insurance Commissioner. The member and subscriber companies of the Middle Department write approximately 78% of the total fire insurance business in Pennsylvania.
For many years fire insurance rates in Pennsylvania were established by four separate territorial rating bureaus with numerous subdivisions. These bureaus began merging their experiences in 1932, and in 1948 they merged into one association known as the Middle Department Association of Fire Underwriters. At that time, with the approval of the Insurance Commissioner, the state was divided into five major areas or zones for the purposes, inter alia, of gathering loss experience and of making rates.[1]
*229 When the Rate Regulatory Act became effective, the Middle Department was licensed as a rate making organization. It filed its constitution and by-laws with the Insurance Department and filed rates for its subscribing members. These rates were amended and changed from time to time, and deviations were allowed various companies with the approval of the Insurance Commissioner.
The Middle Department annually reviews its rates to determine whether they are excessive, inadequate or unfairly discriminatory. Its records showed that for 1952-1956, the loss ratio for the principal classes for which rate differentials are established were 70.4% of premiums for risks written in the City of Philadelphia against 42.1% for the balance of the Commonwealth. The loss ratio by zones was as follows: Zone 1, 39.3%; Zone 2, 47.2%; Zone 3, 40.8%; Zone 4, 70.4%; Zone 5, 48.3%. (See footnote 1). From these figures, filed by the Middle Department with the Insurance Commissioner in support of its rate filing, it is evident that fire insurance rates in these categories were unfairly discriminatory in favor of the owners of Philadelphia property and against the owners of property in the rest of the Commonwealth.[2]
*230 The Middle Department, thereupon, filed a rate adjustment with the Insurance Commissioner on September 17, 1958. The supporting statistics which the Middle Department filed with the commissioner in support of the rate adjustments, were supplied to it by the National Board of Fire Underwriters, The Mutual Insurance Advisory Association, and the National Association of Independent Insurers, all of which are advisory organizations operating under § 10 of the Regulatory Act, 40 P.S. § 1230, and are examined by the Insurance Department.
The Middle Department, in determining whether the average statewide rate level required adjustment, compared the total annual earned premiums of stock and mutual companies averaged for a period of six years (1952 through 1957) with the total incurred losses of such companies for the same six-year period, making provisions for expenses and 6 per cent for underwriting profit and contingencies. It employed an expense ratio of 44.6% determined by deducting a loss adjustment expense estimated at a ratio of 3.4% from the aggregate 1956 expenses of stock companies attributable to Pennsylvania. It adjusted the earned premiums of stock and mutual companies for the years 1952 through 1957 to reflect former rate changes, and then weighed the premium and loss experience for such years by factors of 10 per cent for 1952, 1953 and 1954; 15 per cent for 1955; 25 per cent for 1956; and 30 per cent for 1957. The average loss ratio thus determined amounted to 46.3% to which was added a loss adjustment expense ratio of 3.4%, resulting in an average loss ratio of 49.7% for the six year period. The average loss ratio for stock companies for the six-year period (1952 through 1957) on an adjusted and weighed basis is 52.7% which includes a loss adjustment expense ratio of 3.4%. The Middle Department established a balancing point loss ratio of 49.4% by deducting from *231 100% the aggregate 1956 Pennsylvania expense ratio for stock companies of 44.6%, plus an allowance of 6% for underwriting profit and contingencies.
Since the adjusted and weighed average loss ratio of 49.7% for stock and mutual companies was within two percentage points of the balancing point loss ratio, no adjustment of the average state-wide rate level was requested in the Middle Department's Filing. Indeed, its filing projected an annual decrease of $36,158 in premiums on a state-wide basis.
The Middle Department's calculations for the period 1952 through 1957 show an underwriting profit on an average basis for both mutual and stock companies of 5.7 per cent, which is reduced to 2.7 per cent for stock companies, when the experience of mutual companies is omitted.
Losses for six state-wide occupancy classifications of property; namely, dwellings, household furniture, small stores and dwellings, apartments, mercantile buildings, and mercantile stock, are kept for each of the five separate geographic zones. (See footnote 2)
For rate adjustment purposes, the Middle Department grouped the 115 occupancy classifications established by the National Board of Fire Underwriters into 43 divisions. Proposed rate adjustments for six of such divisions were based upon loss experience applicable to the five geographical zones.
The rates proposed in this Filing on a zone and a state-wide basis for the 43 divisions were based upon loss experience of stock and mutual companies for the years 1952 through 1956. The Middle Department suggested, and the Insurance Commissioner found from the supporting data, that although the aggregate experience of stock and mutual companies did not justify an adjustment of the average state-wide rate level, an adjustment of rates between classifications and between zones was justified.
*232 In proposing rate adjustments on a state-wide and zone basis, the Middle Department employed a loss ratio of 47% as a median point. No changes in rates were proposed where loss ratios on a zone or state-wide basis were within four percentage points above or below such median point, and the maximum rate adjustments upwards and downwards were 30%.
For the purposes of determining rates in Zone 4 (Philadelphia), the Middle Department established A areas and B areas; the B areas representing those sections of the city which have the highest fire incidence. We shall consider this division of Zone 4 in greater detail later in this opinion.
The Middle Department proposed no increase in rates for household dwellings and contents for 90% of the families in Philadelphia which occupy their own home as a single dwelling. Such owner-occupied single dwellings constitute 57% of all dwelling structures in Philadelphia.
One of the expressed purposes of the Regulatory Act is "to enable authorized insurers to meet all requirements of the insuring public of this Commonwealth." Rates which are so low that insurers consistently lose money on them not only violate the Regulatory Act because they are inadequate rates, but also because they do not enable the insurers to meet all requirements of the insuring public. Insurance companies are not required to write fire insurance in Pennsylvania. They cannot be expected to write policies at a loss over a period of years. The commissioner pointed out that the loss ratio was so high in parts of Philadelphia that many insurance companies refused to write insurance on property in the areas, and that it thus was becoming increasingly difficult for people owning property in those areas to obtain fire insurance. It would be a disservice to the insuring public of Philadelphia, as well as illegal, to insist upon the continuation of rates which are clearly inadequate.
*233 By reason of § 4(d) of the Regulatory Act, 40 P.S. § 1224(d), the filing became effective October 17, 1958, and the Insurance Commissioner confirmed this by notice to the Middle Department. The following day the Solicitor of the City of Philadelphia, on behalf of that city, filed a complaint, and the Insurance Commissioner, acting under § 16(a) of the Regulatory Act, 40 P.S. § 1236(a), suspended the effective date of the new filing. Later the City of Pittsburgh filed a complaint, and the commissioner heard the evidence of the Middle Department in support of the new rates and of the two cities in opposition to the filing.[3]
*234 On June 5, 1959, the commissioner made an adjudication and order approving the filing. The rates contained in the filing were made effective on June 22, 1959, and have been in effect since that date.
*235 Philadelphia and Pittsburgh filed timely appeals to the Court of Common Pleas of Dauphin County, and by agreement of the parties the Middle Department was permitted to intervene as a party appellee. In an opinion by President Judge NEELY, the court below dismissed the appeals and affirmed the adjudication of the Insurance Commissioner. The City of Philadelphia alone appealed to this Court.[4]
Viewing the filing as a whole, it was designed to prevent fire insurance rates throughout Pennsylvania from being unfairly discriminatory. To do this, it specifically raised the rates which the loss experience of the companies had shown to be inadequate, and lowered the rates which the loss experience had shown to be excessive.
The issue created by this filing might have been viewed by the commissioner as a narrow one. The insurance companies, through the Middle Department, were not seeking higher premiums for the fire insurance which they were writing in this Commonwealth. They were offering to write the same total fire insurance in Pennsylvania for less money. The purpose of the filing was to adjust rates that appeared to be unfairly discriminatory. Whether such adjustment is proper is the basic issue here involved. If the Middle Department had not made the filing, or had it withdrawn the filing prior to its first becoming effective, as it could have done under § 5(a) of the Regulatory Act (40 P.S. § 1225), or had the commissioner disapproved *236 the filing, the owners of property in Pennsylvania, as a whole, would have continued to pay the insurance companies more for their fire insurance. The petition of the City of Philadelphia filed with the Insurance Commissioner attacked the new rates.
The Insurance Commissioner opened the door to an extensive review of rate making by the Middle Department. The testimony of the city and its argument before us cover the whole field of rate making as though this were an original filing requiring justification in every detail. The Insurance Commissioner, exercising a discretion, dealt with the filing in this manner.
The commissioner having opened the door, we too shall pass upon all of the objections to the adjudication argued before us by the City of Philadelphia, even though many of them do not deal with the adjustment of the rates but with the method of establishing fire insurance rates.
Before passing upon the specific points raised by the city, it is important to examine some general principles applicable to this determination.
The appeal was taken to the courts under the Administrative Agency Law of June 4, 1945, P.L. 1388, as amended. The relevant provision of Section 44, 71 P.S. § 1710.44, are: ". . . the Court shall affirm the adjudication unless it shall find that the same . . . is not in accordance with law . . . or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." In passing upon the adjudication, we must view the evidence in the light most favorable to the party in whose favor the commissioner has found, giving to it the benefit of every inference which can be logically and reasonably drawn from it. Hogan Unemployment Compensation Case, 169 Pa. Superior Ct. 554, 559, 83 A. 2d 386 (1951).
*237 Where an administrative agency is clothed with discretion in the discharge of its duty, the court will not interfere unless the record clearly establishes that there has been a violation of positive law or an arbitrary, capricious or unreasonable determination due to the absence of substantial evidence to support the findings. Mutual Supply Company Appeal, 366 Pa. 424, 426, 77 A. 2d 612 (1951); Blue Mountain T. & T. Co. v. Pa. P.U.C., 165 Pa. Superior Ct. 320, 326, 67 A. 2d 441 (1949); Insurance Company of North America v. Commissioner of Insurance, 327 Mass. 745, 101 N.E. 2d 335 (1951).
As stated in Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 573, 109 A. 2d 331 (1954): ". . . it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion."
Insurance rate making is a technical, complicated and involved procedure carried on by trained men. It is not an exact science. Judgment based upon a thorough knowledge of the problem must be applied. Courts cannot abdicate their duty to examine the evidence and *238 the adjudication, and to interpret and apply the law, but they must recognize the value of the judgment of an Insurance Commissioner who is specializing in the field of insurance and the efficacy of an adjudication supported by evidence of experts who devoted a lifetime of service to rate making. See Blumenschein v. Pittsburgh Housing Authority, supra, p. 572.
Pennsylvania has a large body of law governing utility rate making, and no appellate court opinions discussing insurance rate making. Lest utility rate making rules be applied indiscriminately to insurance rate cases, it is important to note the reasons for making distinctions between the two industries.
First, the need for governmental regulation of utilities and of insurance is based upon a different concept. Government gives utilities a monopoly or a semi-monopoly, forbidding competition except where a need for it is shown. By denying or limiting competition, the government, in practical effect, guarantees customers to utilities, and in exchange reserves the right to fix utility rates. Because the services of utility companies are needed and cannot be obtained elsewhere, unregulated utility companies generally would have no difficulty in exacting exorbitant sums for their services.
On the other hand, insurance companies have no monopoly and no guarantee of customers. The competition is keen. Hundreds of companies are often able and willing to write the same risk. If insurance companies were completely unregulated by government, the danger of undercharging (and thus being unable to pay the losses) might be greater than the danger of overcharging. It was for this reason that the regulation of reserves and examinations of companies for solvency preceded by many years the legal requirement that rates must not be excessive. It was not until combinations of insurance companies to fix rates became *239 general, and companies who joined in the combinations began using coercion to force all companies to accept the same rates, that the need for government control of rates became generally recognized throughout the country as necessary in the public interest. See indictment in United States v. South-Eastern Underwriters Association, supra, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944). The law has recognized the value of agreements among insurance companies to combine information and to set rates, but it also recognizes that the rates thus set are not subject to the restraining influence that free competition exerts over prices or rates, and that to legalize agreements between companies to fix rates without governmental control of the rates would open the door to the fixing of excessive rates by agreement. When insurance is neither subject to rate control or the free hand of competition, rates have a tendency to become excessive. The fair value of a utility service is determinable by the records of one or a very few companies. In regulating the insurance rates on a particular property, the records of many companies must be considered. The government cannot insist upon insurance rates so low that only the most efficient companies can survive. This would violate the entire concept of competition and free enterprise and probably would result in an unconstitutional taking of the property of a great number of companies. On the other hand, the rates cannot be made high enough to guarantee a profit to the least efficient companies, for this would either discourage efficiency or produce excessive profits for the more efficient companies. As it is the expressed purpose of the legislature not to discourage reasonable competition, the Insurance Commissioner must consider the expenses and experiences of many companies. Section 1 of the Regulatory Act (40 P.S. § 1221). This, of necessity, prevents the particularity that can be pursued by the governmental *240 agency in fixing utility rates. The legislature intended that the rates should be within the range between inadequate and excessive.
Furthermore, by the very nature of the business, insurance losses fluctuate far more than utility company costs.
The legislature has recognized these differences by including in its statutes dissimilar provisions. For example, the Public Utility Law provides that the Pennsylvania Public Utility Commission shall "fix" rates for utilities, while the Insurance Regulatory Act provides that the Insurance Commissioner shall "review" filings and "approve . . . or disapprove" rate filings made by the companies or some agency on their behalf. See Public Utility Code of May 28, 1937, P.L. 1053, § 309, 66 P.S. § 1149, and The Fire Marine and Inland Marine Rate Regulatory Act of June 11, 1947, P.L. 551, § 5, 40 P.S. § 1225.

Philadelphia's Contentions

I.
The city contends that "the filer has the burden of proving that its fire rate adjustment filing satisfies all the requirements of the Rate Regulatory Act, and that the rates contained therein are clearly justified."
The Regulatory Act provides that "Rates shall not be excessive, inadequate or unfairly discriminatory." § 3 (a) (2), 40 P.S. § 1223 (a) (2). It further provides: "(3) Due consideration shall be given to past and prospective loss experience within and outside this Commonwealth, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment to the extent appropriate, to the conflagration and catastrophe hazards, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned *241 by insurers to their policyholders, members or subscribers, to past and prospective expenses both country-wide and those specially applicable to this Commonwealth, and to all other relevant factors within and outside this Commonwealth; and in the case of fire insurance rates consideration shall be given to the experience of the fire insurance business during a period of not less than the most recent five year period for which such experience is available." § 3, 40 P.S. § 1223 (a).
The new rates filed by the Middle Department became effective by virtue of § 4(d) of the Regulatory Act, 40 P.S. § 1224(d). After the new rates became effective, the City of Philadelphia filed its petition alleging that it was a person aggrieved by the new rates and applying "under § 16 (a) of the [Regulatory Act] for a public hearing on the said increase," and asked the commissioner to suspend the filing pending a hearing.
Section 4 of the Regulatory Act (40 P.S. § 1224) provides that "The commissioner shall review such of the filings as it may be necessary to review in order to carry out the purpose of this Act," and that "he may require such insurer to furnish the information upon which it supports such filing" and that, if no extension is granted, a filing shall be deemed to meet the requirements of the Act and to become effective unless the commissioner disapproves it within the waiting period. The commissioner did not disapprove the filing within the required period, and, as stated in his adjudication, deliberately permitted the filing to become effective. After the new rate filing became effective, the city filed its complaint, and requested a hearing thereon. The burden was upon the person complaining that the new rates were not in accordance with the Act to prove it. The law presumes that the filing had been examined by the commissioner. By his refusal to disapprove *242 it, it became effective by operation of the statute. The fact that § 16 permits the commissioner to suspend or postpone the effective date of the filing until after a hearing does not change the burden of the complainant to establish its case. Had the new rates never become effective, the situation would be otherwise as the burden is upon the filer to furnish data to support the filing and satisfy the commissioner that the new rates comply with the Regulatory Act. We agree with the Attorney General and the Middle Department that the burden in this case was upon the city. However, the burden is of no serious concern to us at this point as the commissioner examined the evidence to determine whether it supported the filing and decided that it did. We agree.
As we have noted previously, the commissioner permitted a broad attack by the cities upon the fire insurance rates generally. We, too, shall deal specifically with each of the points raised by the city. It should not be overlooked, however, that the insurance companies did not ask for greater statewide income from the new rates, but offered to accept less in order to have the rates more equitable, or in other words, to prevent unfair discrimination. Even if the city were correct in its contentions that all fire insurance rates of the classes involved in the filing are too high, the unfair discrimination between the rates to insure properties in that city and the rates to insure properties elsewhere in the Commonwealth would demand adjustment. (See Footnote 2)
In addition to the city's meritless first contention that the new rates should be disapproved because the filer had a burden which it had not met, it raised other contentions, some subdivided, which we shall pass upon in the order which they appear in the city's brief.

*243 II.
We come then to the city's second contention that the Insurance Commissioner did not exercise his independent judgment, but accepted the judgment of the filer. Unlike the Pennsylvania Public Utility Commission, acting under the Public Utility Law, supra, the Insurance Commissioner acting under the Regulatory Act does not make or fix rates, but merely reviews them and approves or disapproves them. An examination of the record leaves no doubt that the commissioner fully performed his duty in this case by carefully examining the record, making findings thereon, discussing the evidence and making conclusions of law.

III.
The city contends that the statistics upon which the filing is based are not credible. We have discussed the statistics elsewhere. The credibility of the evidence and the data filed in support of the filing is for the Insurance Commissioner. He considered the evidence produced in support of the filing as credible, and we can see no reason why he should have found otherwise. The statistics appear to have been carefully gathered by reliable organizations in accordance with standards approved by the Insurance Commissioner. There is every indication that the supporting data is far more reliable than any offered by the city. That all statistics are not, or cannot be, broken down according to the city's wishes is not important. The statistics are prepared according to standards accepted by the Insurance Commissioner and his colleagues of other states as proper. The evidence in support of the filing is overwhelming.

IV.
In making its rate calculations, the filer used the 1956 expenses reported by insurance companies to the *244 National Board of Fire Underwriters. This was the last reported year before the filing. Although the commissioner had the company's expenses of prior years before him, he was convinced that the 1956 expenses caused no distortion in the filing. Expenses do not vary from year to year like fire losses, and as a general rule the probable future expenses of a business can be more accurately determined by its current expenses than by an average of its expenses over the past five years. The city contends that a six year average of expenses should have been used, but the commissioner pointed out in his adjudication that if the expenses had been projected by leased squares (an actuarial formula for protecting a probable future minimum figure) based upon the last five years of expense, the resulting expense ratio would have been greater than the ratio used by the Middle Department in the filing. The commissioner had before him expense statistics and as required by the Regulatory Act gave "Due consideration . . . to past and prospective expenses both countrywide and those specially applicable to this Commonwealth . . ." § 3(a) (3) Regulatory Act, 40 P.S. § 1223(a) (3).

V.
The city further contends that the expense figures were not sufficiently classified or itemized. The National Board of Fire Underwriters, licensed as a statistical agency under § 6 of the Regulatory Act, 40 P.S. § 1226, by the Insurance Commissioner, a nationally recognized organization, furnished the information. Testimony elicited by the city on cross-examination of the Middle Department's witnesses indicates that the witnesses were not satisfied with the accuracy of a breakdown of the companies' expense statistics, because different methods used by the companies in doing business causes expenses to be classified differently. This *245 does not render valueless the figures of total expenses, as contended by the city. The witnesses had faith in the accuracy of the total expenses even though they doubted the reliability of their breakdown. Neither does the underwriters association's failure to audit the reports of the companies make the figures valueless. The data is derived from sworn reports filed by the insurance companies with the Insurance Commissioner.
The expenses shown in the filing averaged 48% of premiums, which includes a loss adjustment expense of 3.4%. This compares with the National Board of Fire Underwriters' computation of 47.8%. The average arrived at for Pennsylvania is comparable with that of the states of New York (47.1); New Jersey (47.6); Massachusetts (48.0); Illinois (49.9); Michigan (46.2) and California (49.6).
The appellant also attacked the validity of the expense figures, as they relate to commissions paid for the sale of insurance contracts by the different companies. Although the commissions paid to agents and brokers varied from 16½% to 40%, the testimony shows that the commissions paid out of 97% of the premiums earned by the insurance industry in Pennsylvania were between 20% and 30%. There is nothing in the record to indicate that these commissions were excessive.

VI.
There is no merit to the city's objection to the increase in the rate for sprinklered risks. Fire insurance rates for the buildings (and contents) in which approved sprinkler systems are installed are only a fraction of the rates for identical buildings (and contents) without sprinkler systems. The records of the Middle Department indicated that the loss ratio on sprinklered risks was 60% for the five year period from 1952 to 1956. On the basis of this experience, it is clear that *246 the rates on sprinklered risks as a class are too low. Sprinkler systems are generally used in only large buildings. For every sprinklered risk there is an individual rate established by inspection of the particular premise to be rated. This rate is based on the granting of credits or debits to inspected risks because of the particular conditions of the property involved. It exists only for properties of substantial value where the level of premiums justifies special inspection of the property.
These individual rates are made according to established standards approved by, and on file with, the Insurance Commissioner. If the rates on sprinklered risks were too low, as the loss experience indicated, they should have been increased. The filing in Exhibit I, item 65, calls for an increase of 20% in rate adjustment on sprinklered risks which, as stated above, are now enjoying and will continue to enjoy a rate substantially lower than identical buildings without sprinkler systems. The city's objection to the increase is without merit.

VII.
The city contends that the zones "are not based upon similarity of risks and building construction but only upon similarity of loss experience." At the hearing, Philadelphia objected to being zoned alone, and Pittsburgh objected to not being zoned alone. All geographic boundaries, whether they are for the purpose of municipal governments or insurance rating, are in a sense arbitrary,  but useful, nevertheless. Statistics are kept on the basis of zones which were approved by the Insurance Commissioner in 1948. Although certain similarities of risks exist within the zones, the risks vary materially between the zones. Whether the state is zoned to best prevent discrimination in rates and to best collect and classify loss experience is a matter which the commissioner suggested in his adjudication *247 deserves future study by the Middle Department. The purposes of the Regulatory Act are being aided and not violated by the use of the experience available by zones.
Prior to the filing, the Middle Department consulted with personnel of the City of Philadelphia to ascertain whether any means were available to avoid imposing the burden of Philadelphia's poor loss experience upon all residents of the city. Through conferences with the Fire Department, it was ascertained that the fire frequency in certain areas was far above the experience in other areas. As a check on this information, the Middle Department maintained its own record for a period of six months during which the location of fires in the city was tabulated. It found that in the areas defined by the city as fire belts, the fire frequency was three times that of other city areas. Based upon these findings, Philadelphia was divided into "A" areas and "B" areas, the boundary lines of the "B" areas being based on the Philadelphia Fire Department maps outlining the "fire belts".
By establishing "A" areas and "B" areas in Philadelphia, no rate changes were made for 90% of the single family owner occupied dwellings and for 57% of the one to four family dwelling units in the city. These property owners will continue to pay a lower rate than that paid in any of the other largest four cities of this country. The principal increase will fall on the tenant occupied multi-unit houses in the city fire belts which the evidence indicates are responsible for the 61.8% adjusted loss ratio experienced by dwellings in Zone 4 for the period 1952 to 1956.
These facts support the reasonableness of establishing "A" areas and "B" areas within Philadelphia. While there may be properties within the fire zones which are penalized by reason of their location, this always occurs where properties are not individually *248 and specifically rated.[5] Thus, any class which received a reduction in this Filing may include poor fire risk properties as well as those contributing to the good loss experience. Classification by location as well as by usage is reasonable where consistent experience establishes that properties in that location are prone to have fires. That is the basis for establishing the "A" areas and the "B" areas in Philadelphia.

VIII.
The Regulatory Act provides that ". . . due consideration shall be given to . . . a reasonable margin for underwriting profit and contingencies . . ." The Insurance Commissioner approved an allocation of 6% of the premiums for underwriting profit and catastrophe loss. This figure is one which has customarily been used in Pennsylvania insurance rate-making, and is the amount recommended by the National Association of Insurance Commissioners, the Eastern Underwriters Association and the Inter-Regional Conference. The National Association of Insurance Commissioners originally had recommended an 8% figure to be composed of 5% profit factor and 3% catastrophe factor, which is now used in many of the states. A few of the cases reaching the courts indicating acceptable percentages are the following: Aetna Insurance Company v. Hyde (5% of premiums plus 3% additional for conflagration), 275 U.S. 440, 48 S. Ct. 174, 72 L. Ed. 357 (1928); New Orleans Real Estate Board v. Insurance Commission of Louisiana, 177 La. 1091, 150 S. 286 (1933) (5%); Bullion v. Aetna Insurance Company, 151 Ark. 519, 237 S.W. 716 (1922) (5%); Aetna Insurance Company v. Commonwealth, 160 Va. 698, 169 S.E. 859 (1933) (5% of premiums plus a conflagration *249 allowance of 2¼%); American Druggists' Insurance Company v. Commonwealth, 201 Va. 275, 110 S.E. 2d 509 (1959), (5% indemnity profit and 2.25% conflagration or catastrophe).
Federal and State Income Taxes are deducted from profit so that the ratio remaining after taxes is reduced still further to 2.7%. The allowance of 6% for profit and catastrophe is reasonable.
The city argues that "underwriting profit" must be calculated by a percentage of the invested capital of the insurance company and not by a percentage of the premiums. A 1926 Kansas case[6] adopting this concept of insurance profit has been generally rejected elsewhere. Underwriting profit has a firmly established meaning in the insurance industry and in the insurance law. It is calculated on premiums and not invested capital. See above cases.

IX.
The city contends that the income from the investment of unearned premiums was improperly excluded in the calculation of the 5% profit factor. In the insurance industry, that portion of the premium which is applicable to other than the current period is known as unearned premium. These unearned premiums are allocated to an "unearned premium reserve" which is segregated but constitutes a fund available to the companies for investment. The record shows no income (or loss, which is possible) from the investment of any part of the unearned premium reserve.
Regardless of the record of this case, it is clear that the legislature did not intend such income to be included *250 in the determination of "underwriting profit." The Model Bill, from which the Pennsylvania Regulatory Act was drafted, contained only the word "profit" with a footnote to the effect that the insurance industry recommended the inclusion of the word "underwriting" but the National Association of Insurance Commissioners was giving further study to the matter. 4 Richards on Insurance, App. P., p. 2113. The Pennsylvania legislature adopted "underwriting profit," thus specifically limiting the meaning of the word profit. Words in an act shall be construed according to their common and approved usage. Section 33 of the Statutory Construction Act of May 28, 1937, P.L. 1019, 46 P.S. § 533. The accepted meaning of "underwriting profit" is stated in Bullion v. Aetna Insurance Company, supra, 151 Ark. 519, 237 S.W. 716, 718 (1922), as follows: "We think the undisputed evidence shows that the term `underwriting profit' has long had a definite, certain, and well-known meaning in insurance circles. A number of witnesses of highest authority in the insurance business testified that the term was understood alike by all insurance men, and that the word `underwriting' refers to operations of the companies in accepting and carrying risks on the writing of insurance, and refers to that branch of the insurance business in contradistinction to the investment or banking end of the business, and that underwriting profit or loss is arrived at by deducting from earned premiums all incurred losses and incurred expenses."
Philadelphia cites three cases as supporting its argument that "underwriting profit" should include income from the investment of unearned premiums. An examination of these cases will show that they do not support the city's argument, because the statutes involved in these cases did not contain the term "underwriting profit." For example, the Kansas statute discussed *251 in Aetna Insurance Company v. Travis, 124 Kan. 350, 259 P. 1068 (1927), required only that "the rate must be reasonable." For that reason, the Kansas court distinguished the case of Bullion v. Aetna Insurance Company, supra, 151 Ark. 519, 237 S.W. 716 (1922), because the Arkansas statute required profits to be computed on "underwriting profit." 259 P. at 1071 and 1075.
Likewise, the Virginia statute considered in Aetna Insurance Company v. Commonwealth, 160 Va. 698, 169 S.E. 859 (1933), referred only to a reasonable "profit." The Virginia court affirmed the Commission's position that under this statute it was not limited to the profits included in the technical definition of "underwriting profits." 169 S.E. at 868.
While the court in Aetna Insurance Company v. Hyde, 315 Mo. 113, 285 S.W. 65 (1926), does use the word "underwriting," the Missouri statute referred only to "a fair and reasonable profit." Furthermore, the federal district court in Missouri, passing upon the same order that was involved in the state proceedings, reached the opposite result, and held that interest on unearned premiums should not be included as underwriting income. Aetna Insurance Co. v. Hyde, 34 F. 2d 185, 198 (W.D., Mo. 1929).
These three cases do not, therefore, establish the meaning of the term "underwriting profit" as that term was used by the Pennsylvania legislature. On the contrary, they indicate that the legislature by adding the word "underwriting" intended to exclude consideration of investment income.

X.
The city objects to the inclusion of the 1% catastrophe factor in the rate without evidence that such a catastrophe reserve has been established. Catastrophe fires do occur, and insurers assume that risk. It is *252 customary to allow for them in rate making. The allowance of 1% is reasonable. Furthermore, the Regulatory Act provides that in making rates "Due consideration shall be given . . . to the conflagration and catastrophe hazards . . ." § 3(a) (3), supra. To allow nothing for these factors would be a violation of the Act.

XI.
The city suggests that each building should be separately rated, that no distinction should be made between A areas and B areas and that classifying dwellings on whether owner or tenant occupied and by number of families occupying a dwelling is improper. The average 5 year premium on a dwelling in Philadelphia is approximately $28, although the city argues that extended coverage increases the average premium to $56. To separately rate each dwelling is not practical and is not required by law or reason. The loss reports indicate that there is a difference in the risk or probable loss between policies written in A areas and B areas, between owner occupied and tenant occupied dwellings in Philadelphia, and between single and multi-family occupied dwellings. The recognition of these variations in risks is not only desirable in setting rates, but necessary in order to prevent unfair discrimination.

XII.
Finally, Philadelphia charges the Insurance Commissioner with failure to give proper weight to the efforts of that city to reduce its fire losses by spending more money for fire protection, building new fire stations, purchasing modern equipment, training its firemen, inspecting buildings, amending its fire code, increasing water department expenditures, and engaging in urban redevelopment and to its receiving national awards for fire protection and prevention.
*253 The city firemen report each fire to which they are summoned and estimate the loss caused by each. The city apparently considered these estimates of fire losses in the city to have some probative value. These city estimates have no bearing upon the accuracy of the fire losses actually paid by insurance companies over the same period. In the first place, the insurance companies are called upon to pay many insurance losses for fires about which the fire companies never know, because the fires are extinguished before a fire company is summoned, but not before damaging property. Moreover, it is to be expected that the estimates made by firemen would be less than the damage claimed and received by the owners of the property.
With all the activity of Philadelphia to prevent and extinguish fires, praiseworthy as it is, the cold hard facts are that the fire losses covered by insurance within the city have been increasing. There has been no improvement in loss experience in the more recent years considered in the filing, and the 1957 classified experience was even worse than in 1956 in most classes for which rate changes are proposed.
Furthermore, for some years Philadelphia has had the benefit of a better base rate than its fire-fighting facilities warrant. Philadelphia and other cities are inspected by representatives of the Middle Department or National Board of Fire Underwriters, and a careful and detailed analysis is made covering all phases of public fire protection and fire prevention. A grading schedule is applied and a protection grading of the city is determined by a point system which provides for sixteen classifications. Under this system any changes or improvement in fire protection are reflected in revised grading, which, in turn, affects the rates of specific rated properties, and where substantial changes occur in public protection, the class rates are also affected.
*254 Actually, Philadelphia has for some years enjoyed savings in fire rates as the result of a "prospective" approach to its fire losses. This has occurred through the maintenance of its rating by the Middle Department as a Class 2 City in spite of a determination in 1948 by the National Board that a Class 4 grading was appropriate. While the city grading was raised to Class 3 in 1953, all rating in Philadelphia since 1948 has been on the Class 2 grading basis on the strength of city promises that its fire facilities would be rehabilitated.

Conclusion
The City of Philadelphia's attack upon the Insurance Commissioner's Adjudication is without merit. Had the rates in effect prior to the filing been permitted to continue, it would have violated the Regulatory Act which requires that rates shall not be unfairly discriminatory.
Affirmed.
CONCURRING OPINION BY FLOOD, J.:
The scope of judicial review in this case is limited to the determination as to whether there has been a manifest and fraudulent abuse of discretion or a purely arbitrary execution of the Commissioner's duties or functions. Eways v. Reading Parking Authority, 385 Pa. 592, 124 A. 2d 92 (1956). There has been no showing of any such abuse or arbitrary action in this case.
NOTES
[1] The Commonwealth was divided into zones by counties as follows:

Zone 1. Adams, Berks, Bucks, Chester, Cumberland, Dauphin, Delaware, Franklin, Lancaster, Lebanon, Lehigh, Montgomery, Northampton and York.
Zone 2. Bedford, Blair, Carbon, Centre, Clinton, Columbia, Fulton, Huntingdon, Juniata, Lycoming, Mifflin, Monroe, Montour, Northumberland, Perry, Pike, Schuylkill, Snyder and Union.
Zone 3. Armstrong, Beaver, Bradford, Butler, Cambria, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Indiana, Jefferson, Lackawanna, Lawrence, Luzerne, McKean, Mercer, Potter, Somerset, Sullivan, Susquehanna, Tioga, Venango, Warren, Washington, Wayne, Westmoreland and Wyoming.
Zone 4. City of Philadelphia.
Zone 5. Allegheny County, including the City of Pittsburgh.
[2] The adjusted average loss ratios 1952-1957 by zones for dwellings (D); Dwelling contents and household furniture (D.C.); Small stores and dwellings (S. & B.); Mercantile buildings (M.B.) and Mercantile stock (M.S.) were as follows:

 Zone D D.C. S. & D. M.B. M.S.
 I 40.5% 46.2% 35.6% 42.9% 44.4%
 II 46.3% 47.9% 50.0% 45.8% 43.0%
 III 38.9% 43.2% 36.4% 39.4% 40.8%
 IV (Phila.) 62.9% 63.3% 94.5% 82.6% 77.0%
 V 43.0% 49.6% 56.0% 66.7% 51.9%

[3] The Middle Department contended before the Insurance Commissioner and in the court below that the Cities of Philadelphia and Pittsburgh were not aggrieved parties under the Regulatory Act, and had no standing to appeal. The court below decided in favor of the cities. Its holding was not appealed, and the question is not specifically raised here, so we shall not pass upon it.

The city claimed to be an aggrieved party even though none of the insurance premiums paid by the municipal corporation itself was subjected to an increased rate under the filing. Municipal corporations have standing to complain concerning utility rates because the legislature specifically gave them standing to complain in the Public Utility Law of May 28, 1937, P.L. 1053, § 1001, 66 P.S. § 1391. It made no such provision in either of the Insurance Rate Regulatory Acts.
The Insurance Commissioner denied an individual purchaser of fire insurance on Philadelphia property the right to appear and be heard as an insured. If an individual purchaser of fire insurance had no standing to appear and be heard, then the city had no standing to appear and be heard as an insured. If the City of Philadelphia has standing to appear on behalf of its citizens, so does each of the other thousands of municipal units in the Commonwealth. Unlike the interest of plaintiffs in taxpayers' suits, the interests of municipalities in this and similar cases would differ materially. If there is a contest here, it is actually between the rural areas, unrepresented, where insurance rates have been too high, and the big city areas where insurance rates have been too low. The premiums from the rural communities were paying for the excessive losses in the cities.
If it is the duty of a solicitor for a municipal corporation to examine insurance rate filings and enter into a contest on behalf of the municipality's citizens over a rate adjustment, should he urge the approval of the filing on behalf of those people who will pay a lower rate or should he urge the disapproval on behalf of those who will pay a higher rate? (Even in Philadelphia there were some rate reductions. A Philadelphia real estate organization was permitted to appear before the Insurance Commissioner in opposition to the contention of the Philadelphia solicitor.)
During the argument, the solicitor was unable to point to a case anywhere in the country, and we have found none, where a municipality was permitted to participate in an insurance rate hearing as Philadelphia and Pittsburgh were permitted to do in this case. Municipalities and their solicitors do not have unlimited authority to appear before state officers, boards and commissions whenever action by such agencies may affect some of the inhabitants of the municipalities. State Board of Undertakers v. Joseph T. Sekula Funeral Homes, Inc., 339 Pa. 309, 14 A. 2d 308 (1940); Pittsburgh v. Pa. P.U.C., 153 Pa. Superior Ct. 83, 33 A. 2d 641 (1943). For refusal of the Supreme Court of the United States to permit the intervention of Philadelphia in a court case in which the Attorney General was representing the Commonwealth, see New Jersey v. New York, 345 U.S. 369, 97 L. Ed. 1081 (1953).
If in this case the Cities of Philadelphia and Pittsburgh were successful in maintaining or establishing insurance rates unfairly discriminatory to the property holders in other municipalities, it would immediately become incumbent upon the solicitors of the small municipalities to appear before the Insurance Commissioner and be heard on all future insurance rates applicable to the particular borough or township.
The Insurance Commissioner has extensive authority given him by the legislature. This authority and the appropriations of funds for personnel to assist in exercising the authority have been substantially increased by the legislature during the past fifteen years. The Insurance Commissioner has a duty to protect all the people from rates which are excessive, inadequate and unfairly discriminatory. There is no reason to fear that he lacks either the capacity or the willingness to do so.
[4] We are aided in our determination by the thorough and complete adjudication of Insurance Commissioner Francis R. Smith, setting forth in detail his findings, his conclusions and his reasoning, and an opinion by President Judge NEELY which demonstrated the usual intelligent approach to an administrative problem for which he and his court are noted. We also are fortunate in having excellent arguments backed by three unusually thorough briefs ably prepared.
[5] Schlabach v. Commissioner of Insurance, 290 Mass. 585, 195 N.E. 887 (1935).
[6] In Aetna Insurance Company v. Travis, 121 Kan. 802, 257 P. 337 (1926), reheard (1927) sub nom. Aetna Insurance Company v. Travis, 124 Kan. 350, 259 P. 1068, cert. den. 276 U.S. 628, 48 S. Ct. 321, 72 L. Ed. 740 (1928).