IN THE MATTER OF: A FILING MADE BY THE NORTH CAROLINA FIRE INSURANCE RATING BUREAU FOR A REVIEW OF EXPERIENCE OF FIRE INSURANCE

No. 68SC155

(Filed 14 August 1968)

1. **Insurance § 113— fire insurance — necessity — rates**

   The necessity of fire insurance and the desirability of regulating rates charged by fire insurance companies have long been recognized in this State.

2. **Insurance § 116— fire insurance — Rating Bureau — experience statistics**

   All companies writing fire insurance in this State are required by statute to be members of the North Carolina Rating Bureau and to file annual statistical reports showing their respective underwriting experience.

3. **Insurance § 116— fire insurance rates — approval of Commissioner**

   No fire insurance rates become effective until approved by the Commissioner of Insurance.

**4. Insurance § 116— fire insurance rates — profit**

Fire insurance rates should produce a fair and reasonable profit only.

**5. Insurance § 116— fire insurance companies — expenses and profits**

A fire insurance company must pay its cost of doing business, including payment of losses incurred, and obtain a fair profit from money derived from insurance premiums paid at the inception of an insurance contract.

**6. Insurance §§ 113, 131— fire insurance — standard policy — payment for loss**

The standard fire insurance policy in effect in this State requires the insurance company to pay losses to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quantity within a reasonable time after such loss. G.S. 58-176.

**7. Insurance § 116— fire insurance — determining rates**

The problem in formulating a fire insurance rate is to determine what is a fair and reasonable rate to charge now for coverage over a future period when the loss cannot be ascertained until later and payment is based on actual cash value at the time of the loss.

**8. Insurance § 116— fire insurance rates — experience standard**

Fire insurance rates are based upon at least a five year experience standard derived from the cumulative experience of all fire insurance companies doing business within the State.

**9. Insurance § 116— fire insurance rates — adjustment of losses**

One element in the formula for determining a fire insurance rate is the "adjustment of losses" which is ascertained by applying the Consumer Price Index and the Construction Cost Index to the actual losses during the experience years.

**10. Insurance § 116— request for rate change — burden of proof**

Upon the hearing of a request by the Rating Bureau for a change in fire insurance rates, the burden is upon the Rating Bureau to establish its contentions.

**11. Insurance § 116— fire insurance rates — Commissioner's decision**

The order or decision of the Commissioner of Insurance upon a requested increase in fire insurance rates is presumed to be correct and proper if supported by substantial evidence.

**12. Insurance § 116— fire insurance rates — adjustment of losses — prospective loss experience — method of determining**

In determining the "adjustment of losses," the Commissioner of Insurance has the discretion to reject the "trending projection" method proposed by the Rating Bureau and to use a method by which greater weight is given to the actual loss experience in the more recent years in the study period, the latter method complying with the requirement of G.S. 58-131.2 that in determining the necessity for an adjustment in fire insurance rates the Commissioner must consider "prospective loss experience, including loss trend at the time the investigation is made."

**13. Insurance §§ 1, 116— rate-making procedure — determination by Commissioner**

The formulation of new rate-making procedures is a policy matter to be determined by the Commissioner of Insurance.

**14. Insurance § 116— fire insurance rates — statistical evidence**

Statistical evidence which becomes available at any time during a public hearing for the establishment of insurance rates should be admitted and taken into consideration in fixing the rates where the use of such evidence will not result in unreasonable delay.

**15. Insurance § 116— fire insurance rates — use of current statistics in determining**

Since there is of necessity a lag between the fixing of fire insurance rates and the use of proceeds generated thereby, it is incumbent upon the Commissioner of Insurance in the interest of the public and for the protection of the insurance business to use the very latest available statistics to establish a rate which will produce a fair and reasonable profit only.

**16. Insurance § 116— fire insurance rates — consideration of current cost indices**

At a rehearing upon a request by the Rating Bureau for an increase in fire insurance rates, it is error for the Commissioner of Insurance to refuse to admit and consider the latest cost index statistics which became available only after the request for an increase in rates had been filed.

APPEAL by the petitioner, the North Carolina Fire Insurance Rating Bureau, from *Copeland, S.J.,* March 1968, Non-Jury Civil Assigned Session, WAKE County Superior Court.

This is an appeal from a judgment of the Superior Court affirming an order of the Commissioner of Insurance wherein he refused to approve any change in fire insurance rates.

The North Carolina Fire Insurance Rating Bureau, hereinafter called Rating Bureau, under date of 21 July 1967, filed a review of fire insurance experience for the years 1961 through 1966 and requested the Commissioner of Insurance, hereinafter called Commissioner, to approve an overall increase in fire insurance rates of 2.54 per cent.

"The Rating Bureau is an agency created pursuant to Article 13 of Chapter 58 of the North Carolina General Statutes. All companies writing fire insurance in North Carolina are required by statute to be members of the Rating Bureau. It is charged with the responsibility of making and filing rates, rating plans, classifications, schedules, rules and standards for fire insurance, subject to the approval of the Commissioner." *In re Rating Bureau,* 245 N.C. 444, 96 S.E. 2d 344.

After due notice, as provided by law, a public hearing was held on 19 September 1967, and thereafter the Commissioner rendered his decision 17 October 1967 in which he denied any increase in rates. The Rating Bureau filed a petition to rehear pursuant to G.S. 58-131.5. The rehearing was held 21 November 1967, and the Commissioner on 20 December 1967 rendered his decision affirming his earlier decision and again denying any increase in rates.

In accordance with G.S. 58-9.3, the Rating Bureau filed a petition for review in the Superior Court of Wake County, and under date of 22 March 1968, Judge Copeland entered a judgment affirming the orders of the Commissioner and dismissed the appeal.

*T. W. Bruton, Attorney General, Bernard A. Harrell, Assistant Attorney General, for the North Carolina Commissioner of Insurance.*

*William T. Joyner and William T. Joyner, Jr., attorneys for the North Carolina Fire Insurance Rating Bureau.*

CAMPBELL, J.

[1]   Article 13 of Chapter 58 of the General Statutes was enacted in 1945 by the General Assembly of North Carolina. Prior to that time the Commissioner had no power to fix or regulate rates for fire insurance (Statement of Governor J. Melville Broughton in appointing the Commission on Revision of the Insurance Laws of North Carolina as contained in report of said Commission to Governor R. Gregg Cherry, 30 January 1945). The necessity of fire insurance and the desirabiltiy of regulating rates charged by fire insurance companies have long been recognized in this state. Governor Locke Craig in addressing the General Assembly on 7 January 1915 stated: "The protection from fire of our homes and families, of our property and industry is a necessity. We must have insurance, and we must take this insurance under the present law, from a monopoly exercising its powers unrestrained by law * * *. * * * However, this may be, this monopoly is a public service concern."

[2, 3]   As a result of the 1945 action of the General Assembly creating the Rating Bureau, all companies writing fire insurance in North Carolina are now required to be members of the Rating Bureau. All such companies are required to file annually statistical reports showing their respective underwriting experience. It is provided that rates "shall not unfairly discriminate", and no rates become effective until submitted to and approved by the Commissioner.

[4] The Rating Bureau is closely affiliated with the companies who not only must belong to it but who support it. Nevertheless, as Governor Craig stated in his address to the General Assembly in 1915, the people of North Carolina must have insurance and it is a necessity. While it is bad for the people to have rates which are too high, it is, likewise, bad for the people to have rates which are too low and which would thereby tend to cause insurance companies to discontinue their business in North Carolina and, thus, deprive the people of this necessity. In order to serve the best interests of the people of North Carolina, the rates should "produce a fair and reasonable profit only." To this end, the General Assembly enacted:

G.S. 58-131.2. *"Reduction or increase of rates.* — The Commissioner is hereby empowered to investigate at any time the necessity for a reduction or increase in rates. If upon such investigation it appears that the rates charged are producing a profit in excess of what is fair and reasonable, he shall order such reduction of rates as will produce a fair and reasonable profit only.

If upon such investigation it appears that the rates charged are inadequate and are not producing a profit which is fair and reasonable, he shall order such increase of rates as will produce a fair and reasonable profit.

In determining the necessity for an adjustment of rates, the Commissioner shall give consideration to all reasonable and related factors, to the conflagration and catastrophe hazard, both within and without the State, to the past and prospective loss experience, including the loss trend at the time the investigation is being made, and in the case of fire insurance rates, to the experience of the fire insurance business during a period of not less than five years next preceding the year in which the review is made.

Any reduction or increase of rates ordered by the Commissioner shall be applied by the rating bureau subject to his approval within sixty (60) days and shall become effective solely to such insurance as is written having an inception date on and after the date of such approval.

Whenever the Commissioner finds, after notice and hearing, that the bureau's application of an approved rating method, schedule, classification, underwriting rule, bylaw or regulation is unwarranted, unreasonable, improper or unfairly discriminatory he shall order the bureau to revise or alter the application of such rating method, schedule, classification, underwriting

rule, bylaw or regulation in the manner and to the extent set out in the order."

[4]   It is much easier to state that the rates for fire insurance should be such "as will produce a fair and reasonable profit only" than it is to put the statement into practice by formulating such a rate.

The problem is stated:

"Insurance rate making is a technical, complicated and involved procedure carried on by trained men. It is not an exact science. Judgment based upon a thorough knowledge of the problem must be applied. Courts cannot abdicate their duty to examine the evidence and the adjudication, and to interpret and apply the law, but they must recognize the value of the judgment of an Insurance Commissioner who is specializing in the field of insurance and the efficacy of an adjudication supported by evidence of experts who devoted a lifetime of service to rate making." *Insurance Department v. City of Philadelphia*, 196 Pa. Super. 221, 173 A. 2d 811.

[5-7]   Some of the difficulty is because the approved rate is applied and paid by the policyholder to the insurance company at the inception of the insurance contract. From money thus derived, the insurance company pays its costs of doing business and must obtain a fair profit, if it is to stay in business. The costs of doing business include the payment of losses incurred. G.S. 58-176 provides for a standard fire insurance policy for North Carolina and it requires that the insurance company shall pay losses "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss." The evidence in the instant case showed that the vast majority of all insurance policies issued in North Carolina covered a period of three years. Thus, the problem presented is what will be a fair and reasonable rate to charge now for coverage over a three year period when the loss cannot be ascertained until later and payment is based on "actual cash value of the property at the time of the loss." There is a built-in lag between receipts and disbursements, and much clairvoyance is required to formulate a "fair and reasonable" rate. This is a matter for trained actuaries.

[8]   Fire insurance rates, by the statute, are based upon at least a five year experience standard; the experience being a measure of premiums collected against losses incurred. The cumulative experience of all fire insurance companies doing business within the State

is employed in the rate filing. In the instant case the experience years were the calendar years 1961 through 1966 or a total of six years. In calculating the rate, the most recent experience year (in this case 1966) is given the heaviest weighting. The next most recent year is given the next heaviest weighting and so forth in inverse order until the most remote year. This is done to anticipate the prospective loss experience based on current loss trend as provided in the statute.

[9]   By various mathematical calculations, the expert actuaries in rate making derive a formula which is applied and results in the approved rate. All parties were in agreement that one of the elements in the formula is the "adjustment of losses." The "adjustment of losses" is determined by the application of the "Composite Current Cost Index." The Composite Current Cost Index is ascertained by taking the actual losses for the experience years and then adjusting them by applying the "Consumer Price Index" and "Construction Cost Index." These two indices are blended together at a weight of 40 per cent for the Consumer Price Index and 60 per cent for the Construction Cost Index. This weighing of the two on the 40 per cent/60 per cent ratio is on the theory that when a fire occurs 40 per cent of the loss is for chattels and goods, and 60 per cent is for the building. The losses for each year are computed and adjusted separately by application of the Composite Current Cost Index. The Consumer Price Index is published by the United States Department of Labor, Bureau of Labor Statistics. The Construction Cost Index is published by the Department of Commerce. Each of these indices compares the levels of subsequent years with the base level of 100 for the period 1957-1959. For example, on 31 December 1966 the Consumer Cost Index stood at 114.7 and the Construction Cost Index at 123. At the time of filing on 21 July 1967, the latest compiled statistics available as to the Consumer Price Index and the Construction Cost Index was 31 December 1966. By adjusting losses in accordance with those available statistics (31 December 1966), the indicated rate of change in fire insurance rates was 0 per cent.

Up to this point all the expert actuaries on rate making who appeared at the hearing before the Commissioner were in agreement.

The Rating Bureau offered testimony of expert actuaries to the effect that proper rate making required the projection of adjusted losses through June 1968. This projection was to be done by a recognized statistical and mathematical calculation known as "least

squares" method and was referred to in the testimony as the "trending projection" method.

Using the 31 December 1966 statistics and giving 40 per cent weight to the Consumer Price Index and 60 per cent weight to the Construction Cost Index, the resulting Composite Current Cost Index factor for December 1966 was 119.7. Applying the "trending projection" method, the Rating Bureau produced a Composite Current Cost Index figure as of 30 June 1968 of 123.3. Thereafter, using approved and unquestioned rate-making procedures, the Rating Bureau determined that there was a deficiency in rates for the contemplated future period of 2.9 per cent and the Bureau requested increases in rates which produced an overall increase of 2.54 per cent. The Rating Bureau was seeking a fair and reasonable rate as of 30 June 1968 which would be the median point of a three year insurance policy.

In addition to the expert actuaries who testified on behalf of the Rating Bureau, there was another expert actuary who is with the North Carolina Insurance Department. He is Mr. R. E. Holcombe and he testified to the effect that he did not consider the "trending projection" method employed by the Rating Bureau to arrive at a figure as of 30 June 1968 to be "conservative" rate making. He stated: "My position is that you should go no further than the actual events that have been demonstrated." In other words, do not project what the government published statistics might be, but apply only those statistics already published.

[12]    The Rating Bureau makes a strong and plausible contention to the effect that the "trending projection" method is a new rate-making device in order to arrive at a fair and reasonable profit for the insurance companies and that such a method complies with the statute, G.S. 58-131.2 wherein it is provided that the Commissioner shall give consideration to all reasonable and related factors and "prospective loss experience, including the loss trend at the time the investigation is being made." The Rating Bureau points out that this method is rapidly finding approval in formulating fire insurance rates for the future and that the regulatory bodies of several states have adopted such a plan.

[10, 11]    The Rating Bureau is the movant and the burden is upon it to establish its contentions. Its requests in connection with rates is not "presumptively correct and proper"; whereas, the statute provides: "The order or decision of the Commissioner if supported by substantial evidence shall be presumed to be correct and proper." G.S. 58-9.3(b). *In re Rating Bureau, supra.*

**[12, 13]**   We cannot say that the method used by the Commissioner in giving greater weight to the loss experience in the most recent year in the study period and less weight to each year involved in inverse order does not fully comply with statutory requirements of considering "prospective loss experience" based on current loss trend. The Commissioner is a specialist in the field, and he has the responsibility and duty under the law to derive rates which "will produce a fair and reasonable profit only." For the accomplishment of this, the Commissioner is the proper source to evolve policy. Formulating new rate-making procedures is a policy matter and should rest with the Commissioner, and we so hold.

All of the evidence in this case, both that introduced by the Rating Bureau and that of Mr. Holcombe for the Department, indicated that there had been a change in the Consumer Price Index and in the Construction Cost Index since the figures of 31 December 1966. Mr. Holcombe testified that the Consumer Price Index available through June 1967 showed an increase of 1.3 over December 1966, and the Construction Cost Index through June 1967 showed an increase of 3.0 over the December 1966 figure.

**[16]**   The Rating Bureau in apt time petitioned for a rehearing under the statute and in the petition to rehear set forth the latest statistics obtainable from the United States Deparment of Labor, Bureau of Labor Statistics, with regard to the Cost Price Index and, likewise, the latest statistics from the United States Department of Commerce, Bureau of the Census, as to the Construction Cost Index. These statistics showed the figures for August 1967.

These published figures were in accord with the statement of Mr. Holcombe, "My position is that you should go no further than the actual events that have been demonstrated." It was recognized by all witnesses in this proceeding that those published government statistics were proper to be used in deriving the formula on which rates were based. In this instance, if those later figures had been used, it would have resulted in an increased rate basis. The Commissioner refused to consider those figures, however, for that this was evidence originating subsequent to the date of the filing. The evidence in this case shows that those well-recognized statistics could have been applied to the necessary formula without difficulty and without any loss of time. In fact, the evidence reveals that one of the expert witnesses testified that the new available figures could be adopted and a new result obtained within "ten minutes" time.

**[14, 15]**   The law places a duty upon the Commissioner to arrive at rates that are "fair and reasonable" and which will "produce a

fair and reasonable profit" and to that end the Commissioner is "Empowered to investigate *at any time* the necessity for a reduction or increase in rates." (emphasis added) G.S. 58-131.2. Statistical evidence which becomes available "at any time" during a public hearing for the establishment of fire insurance rates and the use of which will produce no unreasonable delay should be admitted and taken into consideration in fixing rates. As heretofore pointed out, there is of necessity a lag between the fixing of rates and the use of the proceeds thereby generated and it is incumbent upon the Commissioner in the interest of the public and the protection of the insurance business which "is a necessity" to use the very latest statistics which are available in order to establish a rate which "will produce a fair and reasonable profit only."

*Bonum necessarium extra terminos necessitatis non est bonum.* (A good thing required by necessity is not good beyond the limits of such necessity.) Hobarts' English Kings' Bench Reports, 144.

[16]    In light of the provisions of the statutes above quoted and the evidence disclosed on the record, the rulings of the Commissioner in refusing to consider the statistical data, which was admitted to be correct, because it became available only after the filing date and which rulings were upheld in the Superior Court, in our opinion, were improper and this cause is remanded for further proceedings consistent with this opinion.

Remanded.

BRITT and MORRIS, JJ., concur.